2003 WY 170

**NATRONA COUNTY, Wyoming; Board of County Commissioners of Natrona County, Wyoming; Office of Natrona County Sheriff; and Mark Benton, in his Official Capacity as Natrona County Sheriff, Petitioners,**

v.

**Jeffrey A. BLAKE, as Personal Representative of the Estate of Daniel O'Brien, Deceased, Respondent.**

No. 02–210.

Supreme Court of Wyoming.

Dec. 31, 2003.

Representing Petitioners: Hoke MacMillan, Wyoming Attorney General; Jay A. Jerde, Senior Assistant Attorney General; and Rick L. Koehmstedt of Schwartz, Bon, Walker & Studer, LLC, Casper, Wyoming. Argument by Messrs. Koehmstedt and Jerde.

Representing Respondent: James E. Fitzgerald of The Fitzgerald Law Firm; and Donald J. Sullivan of Sullivan Law Offices, P.C., Cheyenne, Wyoming. Argument by Mr. Fitzgerald.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] Petitioners, who we will refer to collectively as Natrona County, challenge the district court's order denying their motion to dismiss the wrongful death action filed by Respondent, Jeffery A. Blake (Blake), who is the personal representative of the estate of Daniel O'Brien (O'Brien). On or about September 12, 1999, O'Brien was murdered in Denver, Colorado, by an inmate, Samuel Graumann (Graumann), who escaped from the Natrona County Detention Center (NCDC) on September 10, 1999. Natrona County asserted that it owed no duty to O'Brien and, hence, it was entitled to a ruling that the complaint be dismissed. The district court denied that motion by order entered on September 11, 2002. Natrona

County filed a Petition for Writ of Review seeking this Court's consideration of that order.

[¶ 2] Finding the question to be of significant consequence to the expeditious and economical resolution of this matter, we issued the writ on October 15, 2002, in order that the question be brought before us at an early stage of the proceedings. W.R.A.P. 13.02. Argument was heard on this matter, and it was taken under advisement on April 15, 2003. We will affirm the district court's order denying the motion to dismiss.

### ISSUES

[¶ 3] Natrona County articulates the issue in this fashion:

Samuel Graumann escaped from the Natrona County Detention Center (NCDC) on September 10, 1999. Approximately two (2) days later. Graumann murdered Daniel O'Brien in Denver, Colorado, approximately 280 miles away from the NCDC. Under these circumstances, did the County Defendants owe a legal duty to Daniel O'Brien to protect him from the intentional criminal acts of Samuel Graumann?

Blake rephrases that issue in these terms:

Did petitioners owe a duty to Daniel O'Brien, an innocent citizen killed by a poorly supervised jail inmate [who] petitioners allowed to escape because they, among other failings, ignored a report that a jailbreak was in progress?

### STANDARD OF REVIEW

[¶ 4] Natrona County sought dismissal of Blake's claims under W.R.C.P. 12(b)(6) and (c):

**Rule 12. Defenses and objections; when and how presented; by pleading or motion; motion for judgment on pleadings.**

. . . .

(b) *How Presented.*—Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that **the following defenses may at the option of the pleader be made by motion:** (1) lack of jurisdiction over the subject matter; (2) lack of jurisdiction over the person; (3) improper venue; (4) insufficiency of process; (5) insufficiency of service of process; **(6) failure to state a claim upon which relief can be granted;** (7) failure to join a party under Rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, the adverse party may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

(c) **Motion for Judgment on the Pleadings. After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. [Emphasis added.]**

[¶ 5] In addressing the issue before us, this Court accepts the facts stated in the complaint as true and views them in the light most favorable to the plaintiff. Such a dismissal will be sustained only when it is certain from the face of the complaint that the plaintiff cannot assert any facts that

would entitle him to relief. *Story v. State,* 2001 WY 3, ¶ 19, 15 P.3d 1066, ¶ 19 (Wyo. 2001). Dismissal is a drastic remedy and is sparingly granted; nevertheless, we will sustain a W.R.C.P. 12(b)(6) dismissal when it is certain from the face of the complaint that the plaintiff cannot assert any set of facts that would entitle that plaintiff to relief. *Robinson v. Pacificorp,* 10 P.3d 1133, 1135–36 (Wyo.2000); and *see Van Riper v. Oedekoven,* 2001 WY 58, ¶ 24, 26 P.3d 325, ¶ 24 (Wyo.2001); and *Darrar v. Bourke,* 910 P.2d 572, 575 (Wyo.1996). For purposes of resolving the issues raised in this appeal, we apply the same standard of review with respect to Rule 12(c) as we do to Rule 12(b)(6). 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1369 (1990 and Supp.2003).

■ [¶ 6] In order to state a claim under a negligence/tort theory, a plaintiff must establish these elements: (1) The defendant owed the plaintiff a duty to conform to a specified standard of care, (2) the defendant breached the duty of care, (3) the defendant's breach of the duty of care proximately caused injury to the plaintiff, and (4) the injury sustained by the plaintiff is compensable by money damages. *Valance v. VI–Doug, Inc.,* 2002 WY 113, ¶ 8, 50 P.3d 697, ¶ 8 (Wyo.2002). Further,

"Essential to any negligence cause of action is proof of facts which impose a duty upon defendant. The question of the existence of a duty is a matter of law for the court to decide." *Hamilton v. Natrona County Education Ass'n,* 901 P.2d 381, 384 (Wyo.1995) (quoting *Goodrich v. Seamands,* 870 P.2d 1061, 1064 (Wyo.1994)). A duty may arise by contract, statute, common law, or when the relationship of the parties is such that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff. *Hamilton,* 901 P.2d at 384; *Goodrich,* 870 P.2d at 1064; *Caterpillar Tractor Co. v. Donahue,* 674 P.2d 1276, 1280 (Wyo.1983).

*Hulse v. First American Title Company of Crook County,* 2001 WY 95, ¶ 36, 33 P.3d 122, ¶ 36 (Wyo.2001); *Duncan v. Afton, Inc.,* 991 P.2d 739, 741–42 (Wyo.1999).

" '[D]uty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Gates,* 719 P.2d at 195; *see also* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 54 at 357–58 (5th ed.1984).

When this Court has considered whether a duty should be imposed based on a particular relationship, we have balanced numerous factors to aid in that determination: "(1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved." *Ortega v. Flaim,* 902 P.2d 199, 203, 206 (Wyo.1995) (quoting *Mostert v. CBL & Associates,* 741 P.2d 1090, 1094 (Wyo.1987), *citing to Gates v. Richardson,* 719 P.2d 193, 196 (Wyo. 1986), *quoting Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976)). *Duncan v. Afton, Inc.,* 991 P.2d 739, 744 (Wyo.1999) (footnote omitted).

*Andersen v. Two Dot Ranch, Inc.,* 2002 WY 105, ¶ 44, 49 P.3d 1011, ¶ 44 (Wyo.2002).

### FACTS PLEADED BY BLAKE

[¶ 7] Resolution of the issues presented must rely on the well-pleaded factual allegations contained in Blake's amended complaint. At least two of the prisoners who escaped on September 10, 1999, including Graumann, were dangerous criminals who had a history of escaping from incarceration. Graumann and several other prisoners were permitted to go into the exercise yard, having in their possession objects fashioned for the purpose of an escape. It was nighttime and the prisoners were unsupervised. Both NCDC and the prisoners knew that there were blind spots in the video monitoring system for the exercise area. The prisoners

gathered in one of the blind spots and remained there for a protracted length of time, unguarded and unmonitored. The prisoners had enough time to attach a heavy rope made of bed sheets to the fenced top of the exercise area. They took turns climbing to the top of the exercise area. They cut a hole through the wire fencing that covered the top of the exercise area that was large enough so that they could pass through the wire, and then cut through the razor wire at the top of the jail. A citizen called to notify NCDC that a jailbreak was in progress, but that warning was ignored for 15 to 20 minutes. The prisoners climbed down the outside wall of the jail and proceeded to steal a 20–foot–long moving van parked nearby.

[¶ 8] Blake alleged that personnel of NCDC knew that, given an opportunity, Graumann would attempt to escape, as well as that if he did escape, he would likely commit other crimes to obtain vehicles, cash, credit cards, clothing, and other items necessary to avoid recapture. Graumann posed a high risk of serious injury or death to citizens who crossed his path if he did escape. Natrona County was aware that Graumann, and one of the other inmates involved in the escape, had escaped from other penal institutions and were dangerous criminals.

[¶ 9] As mentioned, during the escape a citizen called NCDC to report that the escape was in progress. The citizen then called a second time to report that prisoners had actually succeeded in escaping from the jail. These warnings were ignored. Natrona County authorities were then made aware that the prisoners had stolen a conspicuous white van with bold black lettering on the side panels **"HOME INSULATION."** The authorities were given the license plate number of that vehicle. Law enforcement agencies outside of Wyoming were not notified of the stolen van or that it was driven by two dangerous prison escapees. Once in Colorado, the prisoners were not actively pursued by police officials. In Colorado, Graumann murdered O'Brien and stole his car, cash, credits cards, and other items to further his escape. Graumann was eventually arrested in Missouri driving O'Brien's car and in pos-

session of other items that had belonged to O'Brien.

## DISCUSSION

[¶ 10] Pertinent to this appeal, Blake's wrongful death claim was brought under the Wyoming Governmental Claims Act (WGCA), Wyo. Stat. Ann. § 1–39–112 (". . . tortious conduct of peace officers acting within the scope of their duties.") (LexisNexis 2003). The purpose of the WGCA is set out in Wyo. Stat. Ann. § 1–39–102 (LexisNexis 2003):

(a) The Wyoming legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the doctrine of governmental immunity and is cognizant of the Wyoming Supreme Court decision of *Oroz v. Board of County Commissioners* 575 P.2d 1155 (1978). It is further recognized that the state and its political subdivisions as trustees of public revenues are constituted to serve the inhabitants of the state of Wyoming and furnish certain services not available through private parties and, in the case of the state, state revenues may only be expended upon legislative appropriation. This act is adopted by the legislature to balance the respective equities between persons injured by governmental actions and the taxpayers of the state of Wyoming whose revenues are utilized by governmental entities on behalf of those taxpayers. This act is intended to retain any common law defenses which a defendant may have by virtue of decisions from this or other jurisdictions.

(b) In the case of the state, this act abolishes all judicially created categories such as "governmental" or "proprietary" functions and "discretionary" or "ministerial" acts previously used by the courts to determine immunity or liability. This act does not impose nor allow the imposition of strict liability for acts of governmental entities or public employees.

Although the WGCA was intended to abrogate governmental immunity in significant part, the statutes begin with the proposition that entities of government are granted immunity from liability, except as further pro-

vided by the statutes, such as Wyo. Stat. Ann. § 1–39–104 (LexisNexis 2003):

§ **1–39–104. Granting immunity from tort liability; liability on contracts; exceptions.**

(a) A governmental entity and its public employees while acting within the scope of duties are granted immunity from liability for any tort except as provided by W.S. 1–39–105 through 1–39–112 and limited by W.S. 1–39–121. Any immunity in actions based on a contract entered into by a governmental entity is waived except to the extent provided by the contract if the contract was within the powers granted to the entity and was properly executed and except as provided in W.S. 1–39–121. The claims procedures of W.S. 1–39–113 apply to contractual claims against governmental entities.

(b) When liability is alleged against any public employee, if the governmental entity determines he was acting within the scope of his duty, whether or not alleged to have been committed maliciously or fraudulently, the governmental entity shall provide a defense at its expense.

(c) A governmental entity shall assume and pay a judgment entered under this act against any of its public employees, provided:

(i) The act or omission upon which the claim is based has been determined by a court or jury to be within the public employee's scope of duties;

(ii) The payment for the judgment shall not exceed the limits provided by W.S. 1–39–118; and

(iii) All appropriate appeals from the judgment have been exhausted or the time has expired when appeals may be taken.

(d) A governmental entity shall assume and pay settlements of claims under this act against its public employees in accordance with W.S. 1–39–115, 1–41–106 or 1–42–107.

**The "Public Duty" Rule**

█ [¶ 11] Natrona County contends that the public duty rule precludes Blake from maintaining this action. As early as 1925, this Court alluded to what has grown into the "public duty" rule in reversing a directed verdict in favor of a governmental entity in a negligence case:

In New Jersey it is held that the exemption of municipal corporations from liability for negligence in performance of public duties does not extend to cases of active wrong-doing chargeable to the corporation. . . . In *Hart v. Freeholders of Union,* 57 N.J.L. 99, 29 A. 490, it is said that there is no reason arising out of public policy why a municipal corporation should be shielded from liability when a private injury arises from wrongful acts as distinguished from mere negligence. We fear that the term "active wrong-doing" is of doubtful meaning. The cases show, however, that the courts of New Jersey refuse to grant absolute immunity to municipal corporations in the exercise of governmental powers.

*Ramirez v. City of Cheyenne,* 34 Wyo. 67, 241 P. 710, 713–14 (1925).

[¶ 12] We have found no precedents of this Court that specifically adopted the public duty rule or even discuss its application in a general sense. For general background on the public duty rule, *see* Dan B. Dobbs, The Law of Torts, § 271 at 723–25 (2000); 57 Am.Jur. 2D *Municipal, County, School, and State Tort Liability* §§ 88–90 (2001). In *DeWald v. State,* 719 P.2d 643, 652–53 (Wyo. 1986) we held:

The State of Wyoming and Officers Baltimore and Keigley have appealed the court's finding that in the absence of qualified immunity, a duty was owed DeWald. They contend that the duty owed by the officers is a public duty only—that, therefore, no duty was owed to DeWald individually and the officers cannot be liable for his death. The source of the "public duty only" rule seems to be Cooley on Torts § 300 at 389 (4th ed.1932) wherein, referring to policemen's duty, it is stated:

"His duty is to serve criminal warrants, to arrest persons who commit offenses in his view, to bring nightwalkers to account, and to perform various offices of similar nature. Within his beat he

954

should watch the premises of individuals, and protect them against burglaries and arsons. But suppose he goes to sleep on his beat, and while thus off duty a robbery is committed or a house burned down, either of which might have been prevented had he been vigilant,—who shall bring him to account for this neglect of duty? Not the individual who has suffered from the crime, certainly, for the officer was not his policeman; was not hired by him, paid by him, or controlled by him; and consequently owed to him no legal duty." (Footnote omitted)

The public-duty/special-duty rule was in essence a form of sovereign immunity and viable when sovereign immunity was the rule. The legislature has abolished sovereign immunity in this area. The public duty only rule, if it ever was recognized in Wyoming, is no longer viable.

In *Schear v. Board of County Commissioners of Bernalillo County,* 101 N.M. 671, 687 P.2d 728, 731 (1984), the court stated:

"[T]he development in the law has been to abolish it in those jurisdictions where the matter has been more recently considered or reconsidered. See *Ryan v. State,* 134 Ariz. 308, 656 P.2d 597 (1982) (overruling *Massengill* ); *Adams v. State; Martinez v. City of Lakewood* [655 P.2d 1388 (Colo.App.1982)]; *Commercial Carrier Corp. v. Indian River County* [371 So.2d 1010 (Fla.1979)] (declaring *Modlin v. City of Miami Beach,* 201 So.2d 70 (Fla.1967) to have no effect following legislative waiver of governmental immunity); *Wilson v. Nepstad,* 282 N.W.2d 664 (Iowa 1979); *Brennen v. City of Eugene,* 285 Or. 401, 591 P.2d 719 (1979); *Coffey v. City of Milwaukee,* 74 Wis.2d 526, 247 N.W.2d 132 (1976). '[T]he trend in this area is toward liability. The "public duty" doctrine has lost support in four of the eight jurisdictions relied upon by the city [for its argument that it owed no duty of ordinary care to an individual citizen].' *Wilson v. Nepstad,* 282 N.W.2d at 667. Those courts have demonstrated a reasoned reluctance to apply a doctrine that results in

a duty to none where there is a duty to all. See *Adams v. State* [Alaska, 555 P.2d 235 (1976)] * * *."

We are in agreement with these statements. The duty owed in the circumstances of this case has been clearly stated by us and need not be restated now.

Following the *DeWald* decision, we had this to say about the public duty rule in *Soles v. State,* 809 P.2d 772, 774 (Wyo.1991):

The Soleses cite case law from several jurisdictions which they claim supports the conclusion that the inspections performed by the Department of Fire Prevention & Electrical Safety should be encompassed by § 1–39–106. We have recognized the main thrust of these cases in *DeWald v. State,* 719 P.2d 643 (Wyo.1986). The basic message conveyed by *DeWald* and the cases cited by the Soleses, as it pertains to this case, is that the doctrine distinguishing between the public-duty rule and the special-duty rule is no longer recognized. The concept that a governmental entity may have a duty to the public in general but no special duty to individual citizens is no longer viable. That holding is not relevant here, for the question is not whether the State owed a duty to the Soleses; rather, it is whether the Wyoming Governmental Claims Act abrogated sovereign immunity under the circumstances of this case.

[¶ 13] In his treatise on Torts, Professor Dobbs comments with respect to a trend toward rejection of the public duty doctrine:

*Rejection of the doctrine.* In a few states, contemporary courts have rejected the public duty doctrine altogether. Some have restricted it to special cases. For example, Georgia uses the public duty doctrine only to exclude liability for failure of police protection. In Rhode Island, the rule seems to be only a way of describing the discretionary immunity. Where the common law public duty doctrine is rejected or limited by judicial decision, statutes sometimes provide for similar results in particular cases. For instance, the statute may exclude liability for failure to make an arrest. Even without such statutes, rejec-

tion of the doctrine does not automatically result in liability. The plaintiff must establish a duty under ordinary tort principles, and then prove negligence, cause in fact, and proximate cause, as in all other negligence cases.

*Rationale and comment.* The logic of the public duty rule is formally different from the logic of immunity. It is that the statute creates no duty to act and hence, regardless of immunity, the public entity cannot be liable. Which statutes create a tort duty and which do not? Courts talk as if the answer lay in statutory construction. If the statutory duty is narrowed to protect a particular class of persons, it may create a tort duty, otherwise not. Little statutory construction is possible in most cases and courts sometimes implicitly admit that it is less a matter of construction than a matter of judicial policy. They have thus suggested numerous reasons to exempt public entities from the obligations apparently imposed by statutes.

One minor argument offered in support of the public duty rule is that non-tort mechanisms exist to deal with official negligence. For example, a negligent officer might be suspended. Another minor argument that could only be applied to a case of police failure to arrest or otherwise protect against a dangerous person is that the offender, not the public entity, should be accountable. Neither argument offers comfort to the victim. More importantly, both arguments are dependent upon the assumption of what is in issue—whether public entities are entitled to some special exemption from tort rules applied to private defendants. That assumption can be seen by noticing that such arguments do not relieve private enterprise. No matter how confident judges might be that a private company would discharge an employee who failed to comply with a statute, judges do not relieve companies of their obligations.

A much more serious argument is essentially the same argument presented for the discretionary immunity. Expressed in various ways, the core proposition is that courts should leave allocation of resources to the legislature or to the executive. The argument is persuasive in some cases, but not all cases involve allocation of substantial resources. Some involve simply bad mistakes or horrendous negligence. The officer who simply watches a drunk driver go through dangerous antics for a substantial period without attempting to deal with the situation is not allocating resources; he is behaving very negligently indeed. The resources argument is puzzling, too, when compared to the same argument on the issue of discretionary immunity. A statutory directive to act in a particular way—to investigate reports of child abuse, for example—seems to remove all discretion. Yet the public duty doctrine is intended to foster and protect discretion in the very case where statutes seemed to have removed it.

A third argument seems to be predicated upon a deep distrust of the judicial system itself. The argument implicitly asserts that courts cannot formulate and administer an appropriate rule about the scope of liability. An officer should have no duty to arrest a drunk driver he encounters, one court said, because if he tries "to avoid liability by removing from the road all persons who pose any potential hazard, he may find himself liable in many instances for false arrest." It is hard to believe that courts would administer the reasonable care rule of negligence law to require the arrest of every hazardous driver from the road in the first place. If courts did such an unprecedented thing, they could hardly impose liability for doing what they required.

Although the arguments do not seem broad enough to support a public duty rule, they rightly point to particular instances in which liability is inappropriate. For instance, if an officer must choose when to arrest a dangerous person, appropriate caution may counsel delay. If so, he cannot be found negligent. In the same way, a busy precinct may have no officers to spare for the protection of every person within its jurisdiction. If not, it cannot be found negligent. Ordinary negligence rules appropriately exclude liability in such cases, but they leave open the possibility of

liability when police officers unprofessionally shirk their duty and when administrative bumbling sends officers to the wrong place. The public duty doctrine, in contrast, excludes liability in all cases in which agencies fail to enforce or obey a statutory directive that is deemed to create a duty to the public at large.

The Law of Torts, *supra*, § 271 at 725–27.

[¶ 14] In the treatise, 18 Eugene McQuillin, The Law of Municipal Corporations §§ 53.04.25 and 53.04.30 (3rd ed.2003), a similar discussion can be found. In most pertinent part:

But even public duty rule has been abrogated or limited in a number of jurisdictions. The states have rejected the public duty rule because the rule is, in effect if not in theory, a continuation of the abolished governmental immunity doctrine. The rule also creates confusion in the law and produces uneven and inequitable results in practice. Courts abrogating the rule reject the contention that the public duty rule is the only principle protecting municipalities from massive liabilities; these courts maintain that ordinary tort rules, such as the rule requiring foreseeability of harm, will adequately limit the scope of municipal liability. These courts also remind us that abrogation of the doctrine of municipal governmental immunity merely removes the defense of immunity and does not create any new liability for a municipality.

Courts that have considered, but rejected, abrogation of the rule have pointed out that jurisdictions that have abrogated the rule have had other immunity rules that protect municipalities. For example, a state may decline to adopt the public duty doctrine as a means of limiting the liability of government employees who are already protected to some extent by the doctrine of qualified official immunity. Of course, where the jurisdiction has not rejected government immunity in any form, there is no reason to abrogate the public duty doctrine.

Some courts have retained the public duty rule, but have eroded it by adding further exceptions. For example, an exception may be made where the municipality's actions were particularly "egregious."

*Id.*, § 53.04.25, at 206–9; *also see* 2 J.D. Lee and Barry A. Lindahl, Modern Tort Law, § 16:9 (2002); John H. Derrick, Annotation, *Modern Status of Rule Excusing Governmental Unit from Tort Liability on Theory that Only General, not Particular, Duty Was Owed under Circumstances*, 38 A.L.R.4th 1194, § 4 (1985 and Supp.2002).

[¶ 15] Of course, there remain pockets of continued recognition of the public duty rule. However, our confidence that the public duty rule should no longer have vitality in circumstances such as those presented here is strengthened by similar conclusions reached by many of our sister jurisdictions. *Wallace v. Ohio Department of Commerce*, 2002–Ohio–4210, 96 Ohio St.3d 266, 773 N.E.2d 1018, 1022–32 (2002) (collecting and analyzing cases); *Beaudrie v. Henderson*, 465 Mich. 124, 631 N.W.2d 308, 311–17 (2001); *Doucette v. Town of Bristol*, 138 N.H. 205, 635 A.2d 1387, 1388–91 (1993); *Jordan v. City of Rome*, 203 Ga.App. 662, 417 S.E.2d 730, 733–34 (1992); *McQueen v. Williams*, 587 So.2d 918, 925–28 (Miss.1991) (dissenting opinion); *Leake v. Cain*, 720 P.2d 152, 155–60 (Colo. 1986); and *Schear v. Board of County Commissioners*, 101 N.M. 671, 687 P.2d 728, 730–34 (1984).

[¶ 16] We continue to hold that the concept of public duty does not bar an action such as the instant case under governing Wyoming law.

### Did Blake's Complaint State a Cause of Action Sounding in Tort

[¶ 17] Natrona County asserts that even if the "public duty" rule is not viable, nonetheless no duty was owed by it to O'Brien. Wyo. Stat. Ann. § 18–3–603(a) provides:

(a) Each sheriff has charge of the jail and the prisoners therein confined in his county. The prisoners shall be kept by the sheriff or by a deputy or detention officer appointed for that purpose, and for whose acts he and his sureties are liable. The sheriff shall provide three (3) nutritionally balanced meals each day for each prisoner.

Each sheriff shall make a monthly accounting to the board of county commissioners to show that the expenditures have actually been made.

[¶ 18] In Restatement (Second) of the Law, Torts § 319 (1965 and Appendix 1999, Supp.2003) we find this recitation of a basic principle of tort law:

§ 319. **Duty of Those in Charge of Persons Having Dangerous Propensities** One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

[¶ 19] The subject at hand has been well annotated, though no clear thread may be gleaned from the cases in point. Several courts have affirmed the dismissal or grant of summary judgment in such cases, and the "public duty" rule has been relied upon in many of those instances. In others, statutory immunity has been the deciding point. In several others, courts have held that a duty does lie and that proximate cause and foreseeability are questions for the jury to decide. We join with this latter group in our decision today. *See generally,* Don F. Vaccaro, Annotation, *Liability of Public Officer or Body for Harm Done by Prisoner Permitted to Escape,* 44 A.L.R.3d 899 (1972 and Supp 2001).

[¶ 20] As a point of embarkation, we look to the Supreme Court of Arizona's decision in *Ryan v. State,* 134 Ariz. 308, 656 P.2d 597 (1982). In *Ryan* a 17–year–old inmate escaped from the Arizona Youth Center. After his escape, the youth robbed a convenience store and shot the proprietor at point-blank range with a shotgun. The victim sustained permanent and disabling injuries. That court determined that it would define the limitations of immunity as it pertains to the executive branch of government "on the basis of concrete, factual situations as they come before us." *Id.,* at 600. In conclusion, it held that it would "endorse the use of governmental immunity as a defense only when its application is necessary to avoid a severe hampering of a governmental function or thwarting of established public policy. Oth-

erwise, the state and its agents will be subject to the same tort law as private citizens." *Id.* Thus, summary judgment for the state defendants was reversed.

[¶ 21] In the case, *Cansler v. State,* 234 Kan. 554, 675 P.2d 57 (1984) (collecting cases), the Supreme Court of Kansas dealt with a case where a police officer was severely wounded by gunfire from several inmates who escaped from the Kansas State Penitentiary. Cansler's complaint suggested the escape could and should have been prevented and, although efforts had been made to send out an alarm to the surrounding area, a computer was down and the message did not go out. No notification was given to a neighboring county, in which the victim worked as a police sergeant. *Id.,* at 60–61. After summarizing the law extant at that time, the Kansas court concluded that "Cansler has adequately alleged a duty on the part of the State, a breach thereof, and a causal connection between the breach of that duty and the injuries and damages sustained." *Id.,* at 66. The *Cansler* case was before the court on an interlocutory appeal similar to the posture of this case.

[¶ 22] The Supreme Court of Louisiana has also spoken directly to the issue we address today. In the case, *Marceaux v. Gibbs,* 699 So.2d 1065, 1069–70 (La.1997), the court set this standard for such cases:

In order to recover for injuries caused by an escaped prisoner, an injured plaintiff must prove the following:

(1) negligence on the part of the custodian in managing the facility;

(2) that this negligence facilitated the escape;

(3) that the escapee's actions caused the harm complained of; and,

(4) that the risk of harm encountered by the plaintiff falls within the scope of duty owed by the custodian.

The Louisiana court also held that to determine the scope of the duty owed by the custodians, the question that must be answered is whether the offense occurred during or as an integral part of the escape. An offense committed 13 days after the escape was held to be "a necessary and integral

component of the escape process." *Id.*, at 1070. *Also see, Wilson v. Department of Public Safety and Corrections,* 576 So.2d 490, 492–95 (La.1991); and *Edwards v. State,* 556 So.2d 644, 649–50 (La.App. 2 Cir.1990).

[¶ 23] The Supreme Court of Texas has given general recognition to the Restatement (Second) of Torts cited above, in circumstances involving the escape of a juvenile mental patient who had been transferred to a private care facility. *Texas Home Management, Inc. v. Peavy,* 89 S.W.3d 30, 36 n. 5 (Tex.2002) (collecting cases).

[¶ 24] We conclude that a duty does exist under the circumstance pleaded by Blake, and that other questions presented by this case are appropriate for resolution by a jury.

## CONCLUSION

[¶ 25] The order of the district court denying Natrona County's motion to dismiss is affirmed.

GOLDEN, Justice, filed a dissenting opinion, in which LEHMAN, Justice, joins.

GOLDEN, Justice, dissenting, in which LEHMAN, Justice, joins.

[¶ 26] I respectfully dissent and would reverse the district court's ruling and dismiss the amended complaint. Having carefully considered the parties' briefs and oral arguments, I am persuaded that the county defendants' argumentation best captures the applicable law. As explained in more detail below, I would hold that the county defendants did not owe a duty to protect Daniel O'Brien from the intentional criminal acts of Samuel Graumann. In this regard, I would hold that the public duty rule precludes the O'Brien estate from maintaining a negligence action against the county defendants. But even if the public duty rule were not applied here, I would hold that the county defendants still did not owe a duty of care to Daniel O'Brien under the general principles of tort law. In my judgment, the "balance of the factors" test from *Gates v. Richardson,* 719 P.2d 193, 196 (Wyo.1986), weighs in favor of a conclusion that the county defendants did not owe a duty of care to O'Brien because, among other things, O'Brien's murder

was not foreseeable and, moreover, was too remote in time and distance from the date and location of Graumann's escape.

### The Public Duty Rule Dictates that County Defendants Owed No Duty to Daniel O'Brien

[¶ 27] The district court concluded that the sheriff's statutory duties as custodian of the jail create a duty which the county defendants owed to O'Brien under the circumstances of this case. In reaching this conclusion, the district court explained that these custodial duties imposed by statute are intended to protect the general public. If the duty owed to O'Brien arises from a statutory duty owed to the general public, then the public duty rule precludes O'Brien's estate from maintaining a negligence claim against the county defendants in this case.

### A. The public duty rule and its origins.

[¶ 28] The public duty rule dictates that where a governmental entity has a duty to the general public, as opposed to a particular individual, a breach of that duty does not result in tort liability. 18 Eugene McQuillin, *McQuillin Municipal Corporations* § 53.04.25, at 194 (3d ed.2003). The public duty rule originated at common law. *Wallace v. Ohio Dep't of Commerce,* 96 Ohio St.3d 266, 773 N.E.2d 1018, 1022 (2002); *Beaudrie v. Henderson,* 465 Mich. 124, 631 N.W.2d 308, 311 (2001); *Zimmerman v. Village of Skokie,* 183 Ill.2d 30, 231 Ill.Dec. 914, 697 N.E.2d 699, 702 (1998); *Ezell v. Cockrell,* 902 S.W.2d 394, 397 (Tenn.1995); *Braswell v. Braswell,* 330 N.C. 363, 410 S.E.2d 897, 901 (1991); 57 Am.Jur.2d *Municipal, County, School, & State Tort Liability* § 88 (2001). The United States Supreme Court first recognized the public duty rule in this country in *South v. Maryland,* 59 U.S. (18 How.) 396, 402–03, 15 L.Ed 433 (1855).

[¶ 29] At least twenty jurisdictions have adopted the public duty rule in some form. *See* John H. Derrick, Annotation, *Modern Status of Rule Excusing Governmental Unit from Tort Liability on Theory that Only General, Not Particular, Duty was Owed Under Circumstances,* 38 A.L.R.4th 1194

(1985 & Supp.2001); *Wallace,* 773 N.E.2d at 1024 n. 6 (collecting cases). In most of these jurisdictions, courts have held that a judicial or legislative abrogation of sovereign or municipal immunity did not abrogate the public duty rule. *See, e.g., Ezell,* 902 S.W.2d at 399 & n. 5 (collecting cases). At least thirteen jurisdictions, including Wyoming, currently do not recognize the public duty rule. *See Derrick, supra; Wallace,* 773 N.E.2d at 1024 n. 5 (collecting cases). In each of these jurisdictions, the courts have concluded that the public duty rule did not survive the abolition of municipal and sovereign immunity. *See Ezell,* 902 S.W.2d at 398 & n. 4 (collecting cases).

### B. The public duty rule in Wyoming.

[¶ 30] Before 1986, this Court had not expressly adopted the public duty rule as it related to law enforcement activities, although it arguably recognized the public duty rule in *dicta* in *Ramirez v. City of Cheyenne,* 34 Wyo. 67, 73–75, 241 P. 710, 711–12 (1925). In 1986, this Court rejected the public duty rule with respect to certain state law enforcement activities in *DeWald v. State,* 719 P.2d 643 (Wyo.1986). In *DeWald,* the personal representative of the estate of a man killed when a drunk driver, fleeing from state highway patrol officers, collided with his vehicle sued the State of Wyoming and the state highway patrol officers for negligence under two different provisions of the Wyoming Governmental Claims Act (WGCA). *Id.* at 645–47.

[¶ 31] The state defendants asserted the public duty rule as a defense to the negligence claims. *Id.* at 652. The *DeWald* court rejected the public duty rule defense, explaining that "[t]he public duty/special duty rule was in essence a form of sovereign immunity and viable when sovereign immunity was the rule. The legislature has abolished sovereign immunity in this area. The public duty only rule, if it ever was recognized in Wyoming, is no longer viable." *Id.* at 653. The *DeWald* court also cited with approval the reasoning of the New Mexico Supreme Court in rejecting the public duty rule in New Mexico. *Id.* at 653 (citing *Schear v. Board of County Comm'rs of Ber-*

*nalillo Cty.,* 101 N.M. 671, 687 P.2d 728, 731 (1984)).

### C. *DeWald* does not preclude this Court from applying the public duty rule in this case.

[¶ 32] Although the *DeWald* court rejected the public duty rule with respect to certain state law enforcement activities, the holding in *DeWald* does not preclude this Court from applying the public duty doctrine in this case. *DeWald* does not establish binding precedent with respect to the applicability of the public duty rule in this case because (1) the holding in *DeWald* with respect to the public duty rule is limited to state law enforcement officers only; and (2) the *DeWald* court erred in finding that the public duty rule was a form of sovereign immunity—the public duty rule is a fundamental principle of negligence law and not a type of municipal or sovereign immunity.

#### 1. The holding in *DeWald* with respect to the public duty rule is limited to state peace officers only.

[¶ 33] In rejecting the public duty rule, the *DeWald* court explained that the public duty rule was a form of sovereign immunity that was abolished when the legislature waived sovereign immunity for the negligent operation of a motor vehicle by public employees and for the tortuous conduct of peace officers. *DeWald,* 719 P.2d at 653. Given the jurisprudential history of the doctrines of municipal and sovereign immunity in Wyoming, the *DeWald* court's finding that the public duty rule is a form of sovereign immunity necessarily limits the scope of the public duty rule holding in *DeWald* to state peace officers.

[¶ 34] In the decade before *DeWald,* this Court distinguished sovereign immunity from municipal immunity. *See Worthington v. State,* 598 P.2d 796, 799–800 (Wyo.1979); *Oroz v. Bd. of Cty. Comm'rs of Carbon Cty.,* 575 P.2d 1155, 1157–58 (Wyo.1978). At the time *DeWald* was decided, this Court had clearly established that the doctrine of sovereign immunity applies to the State of Wyoming only and not to local governmental entities such as counties. *See State v. Sto-*

*vall,* 648 P.2d 543, 548 (Wyo.1982). By characterizing the public duty rule as a form of sovereign immunity, the *DeWald* court specifically limited its holding with respect to the public duty rule to negligence claims against state peace officers.[1] *DeWald* thus does not preclude this Court from applying the public duty rule in this case as the estate of Daniel O'Brien has asserted a negligence claim against county peace officers, not state peace officers.

## 2. The *DeWald* court erred in holding that the public duty rule was a form of immunity.

[¶ 35]   Given that this case involves a negligence claim against county peace officers, *DeWald* does not establish binding precedent with respect to the application of the public duty rule in this case. Even if this Court gives *DeWald* persuasive weight in addressing the duty issue in this case, this Court should decline the opportunity to extend *DeWald* to negligence claims against county peace officers because the *DeWald* court incorrectly concluded that the public duty rule is a form of immunity.

[¶ 36]   At common law, the doctrines of municipal and sovereign immunity co-existed with the public duty rule. *Wallace,* 773 N.E.2d at 1023. Municipal immunity first received judicial recognition in 1788. *Oroz,* 575 P.2d at 1157 (citing *Russell v. The Men of Devon,* 100 Eng. Rep. 359 (1788)). Sovereign immunity was recognized as early as 1483. *Worthington v. State,* 598 P.2d at 800 n. 1. Recognition of the public duty rule dates back to 1765. *South,* 59 U.S. at 403, 15 L.Ed. 433 (citing *Entick v. Carrington,* 2 Wils. K.B. 2275 (1765)). The common law origins of the respective legal doctrines confirm that the public duty rule defense exists independent of the doctrines of municipal and sovereign immunity. *Wallace,* 773 N.E.2d at 1023; *Tanner v. Florence Cty. Treasurer,* 336 S.C. 552, 521 S.E.2d 153, 157 (1999); *Zimmerman,* 231 Ill.Dec. 914, 697 N.E.2d at 707; *Benson v. Kutsch,* 181 W.Va. 1, 380 S.E.2d 36, 37 (1989); *Motyka v. City of*

*Amsterdam,* 15 N.Y.2d 134, 256 N.Y.S.2d 595, 204 N.E.2d 635, 636 (1965); McQuillin, *supra,* § 53.04.25.

[¶ 37]   The public duty rule has a different legal rationale from municipal and sovereign immunity. The public duty rule is grounded in tort law, not immunity. *White v. Beasley,* 453 Mich. 308, 552 N.W.2d 1, 6 (1996); *Cracraft v. City of St. Louis Park,* 279 N.W.2d 801, 804 (Minn.1979). As the Supreme Court of Illinois explains,

> [U]nder the inapplicable concept of sovereign immunity, despite any apparent duty, the governmental entity is immune from tort liability. This does not occur from a denial of the tort's existence, but rather because the existing liability in tort is disallowed. In contrast, under the rationale of the public duty rule the tort liability or duty never existed.

*Zimmerman,* 231 Ill.Dec. 914, 697 N.E.2d at 708 (citation, internal quotations, and brackets omitted). In a similar vein, the Supreme Court of South Carolina explains the difference between the public duty rule and immunity as follows:

> The public duty rule is distinguishable from a defense of immunity, which is an affirmative defense which must be pleaded and can be waived. A defendant who pleads immunity conditionally admits the plaintiff's case, but asserts immunity as a bar to liability. In contrast, the public duty rule is a defense that denies an element of the plaintiff's cause of action—the existence of a duty of care to the individual plaintiff.

*Steinke v. South Carolina Dep't of Labor, Licensing & Regulation,* 336 S.C. 373, 520 S.E.2d 142, 150 (1999).

[¶ 38]   The foregoing cases illustrate the fundamental conceptual difference between the public duty rule and the doctrines of municipal and sovereign immunity. The doctrines of municipal and sovereign immunity protect governmental entities from liability for breach of an otherwise enforceable duty, while the public duty rule determines wheth-

---

**1.**   The *DeWald* court's focus on sovereign immunity makes sense when one considers that *DeWald* involved two distinct negligence claims asserted against the State of Wyoming and two state highway patrol officers.

er a duty in tort exists. *Id.* at 150; *Wallace,* 773 N.E.2d at 1023; *Tanner,* 521 S.E.2d at 157; *Zimmerman,* 231 Ill.Dec. 914, 697 N.E.2d at 708; *Tipton v. Town of Tabor,* 567 N.W.2d 351, 357 & n. 9 (S.D.1997); *White,* 552 N.W.2d at 6; *Rollins v. Petersen,* 813 P.2d 1156, 1162 n. 3 (Utah 1991); *Cracraft,* 279 N.W.2d at 803–04; McQuillin, *supra,* § 53.04.25.

[¶ 39]   In characterizing the public duty rule as a form of sovereign immunity, the *DeWald* court did not conduct a reasoned inquiry into the distinct legal differences between the public duty rule and sovereign immunity.   Given the cursory legal analysis of the public duty rule issue in *DeWald,* this Court should disregard *DeWald* in addressing whether the public duty rule applies in this case.

**D.   Applying the public duty rule in this case is consistent with the legislative intent on the Wyoming Governmental Claims Act.**

[¶ 40]   The estate of Daniel O'Brien bases its claim against the county defendants upon the "tortious conduct of peace officers" exception to governmental immunity in the WGCA. *See* Wyo. Stat. Ann. § 1–39–112 (LexisNexis 2003).   I would apply the public duty rule in this case because doing so is consistent with the legislative intent of the WGCA.

[¶ 41]   In interpreting a statute such as the WGCA, this Court must determine the legislature's intent in enacting the statute. *Palato v. State,* 988 P.2d 512, 513 (Wyo.1999). In enacting the WGCA, the Wyoming legislature "intended to retain any common law defenses which a defendant may have by virtue of decisions from this or other jurisdictions." Wyo. Stat. Ann. § 1–39–102(a) (LexisNexis 2003).   The unambiguous language of § 1–39–102(a) shows a legislative intent to preserve all common law tort defenses which have been recognized in Wyoming or in any other jurisdiction in the United States.   The public duty rule is a common law defense to negligence claims which has been recognized in numerous jurisdictions in this country. *See Ezell,* 902 S.W.2d at 399 & n. 5 (collecting cases); *Wallace,* 773 N.E.2d at 1024 n. 6

(collecting cases).   Accordingly, this Court must apply the public duty rule in this case as a matter of legislative intent.

**E.   Application of the public duty rule given the facts of this case.**

[¶ 42]   The public duty rule precludes the estate from maintaining a negligence claim against the county defendants in this case. To maintain a claim of negligence, a plaintiff must prove, *inter alia,* that the defendant had a duty of care to protect the plaintiff from injury. *Andersen v. Two Dot Ranch, Inc.,* 2002 WY 105, ¶ 11, 49 P.3d 1011, ¶ 11 (Wyo.2002).   "If no duty is established, there is no actionable claim of negligence." *Id.*

[¶ 43]   The estate of Daniel O'Brien has alleged that the county defendants were negligent in allowing Graumann to escape from the NCDC. The district court found that the duty with respect to the alleged negligence in allowing the escape arises from § 18–3–603, which provides that each sheriff in Wyoming "has charge of the jail and the prisoners therein confined in his county." Wyo. Stat. Ann. § 18–3–603 (LexisNexis 2003).   To the extent that § 18–3–603 imposes a duty, any such duty benefits the general public, not individual citizens such as O'Brien.

[¶ 44]   The public duty rule precludes an individual from maintaining a claim for negligence against a governmental entity and its employees for the breach of a public duty. *Wallace,* 773 N.E.2d at 1022–23; *Zimmerman,* 231 Ill.Dec. 914, 697 N.E.2d at 708. Any duty imposed by § 18–3–603 is a public duty.   The public duty rule thus dictates that the estate cannot maintain an action against the county defendants for negligence in this case.

[¶ 45]   In urging this Court not to apply the public duty rule in this case, O'Brien's estate argues that "the public duty rule is a harsh rule that denies individuals the right to have the fact finder decide whether a governmental entity breached the duty it owed." O'Brien's estate further contends that adoption of the public duty rule "for all intents and purposes would nullify" § 1–39–112, thereby rendering this section of the WGCA

meaningless. Both of these arguments lack merit as a matter of law.

[¶ 46] In stating that the public duty rules denies individuals the right to have the fact finder decide whether a governmental entity breached a duty it owed, O'Brien's estate incorrectly characterizes the public duty rule as a type of immunity. The doctrines of municipal and sovereign immunity protect governmental entities from liability for breach of an otherwise enforceable duty. The public rule duty, on the other hand, denies an essential element of the negligence cause of action—the existence of a duty of care to an individual plaintiff. *Steinke,* 520 S.E.2d at 150; *see also Wallace,* 773 N.E.2d at 1023; *Tanner,* 521 S.E.2d at 157; *Zimmerman,* 231 Ill.Dec. 914, 697 N.E.2d at 708; *Tipton,* 567 N.W.2d at 357 & n. 9; *White,* 552 N.W.2d at 6; *Rollins,* 813 P.2d at 1162 n. 3; *Cracraft,* 279 N.W.2d at 804; McQuillin, *supra,* § 53.04.25. The public duty rule does not immunize a governmental entity from an otherwise enforceable duty, but instead dictates that a governmental entity and its public employees do not owe a duty to an individual plaintiff for injuries resulting from the breach of a statutory duty.

[¶ 47] The argument made by O'Brien's estate that application of the public duty rule would nullify § 1–39–112 and render this section of the WGCA meaningless also lacks merit. Section 1–39–112 waives sovereign immunity for damages resulting from the tortious conduct of peace officers while acting within the scope of their duties. Given its ordinary and obvious meaning, the phrase "tortious conduct" in § 1–39–112 encompasses a variety of tort causes of action, including intentional torts such as assault, battery, and false arrest. The public duty rule precludes only a narrow class of tort claims—it precludes an individual plaintiff from suing a governmental entity on a negligence theory for injuries resulting from the breach of a statutory duty. Even if this Court adopts the public duty rule, an individual still could seek legal redress under § 1–39–112 for injuries resulting from intentional torts and other torts committed by peace officers. Adopting the public duty rule thus would not

nullify § 1–39–112 and render this section of the WGCA meaningless.

[¶ 48] Section 1–39–102(a) of the WGCA expressly states that the WGCA "is intended to retain any common law defenses which a defendant may have by virtue of decisions from this or other jurisdictions." O'Brien's estate contends that application of the public duty rule in this case would contravene the legislative intent of the phrase "common law defenses" in § 1–39–102(a). O'Brien's estate then argues that the phrase "common law defenses" in § 1–39–102(a) means only those defenses "that provide absolute immunity to specific government officials."

[¶ 49] The estate's interpretation of the phrase "common law defenses" lacks merit for two reasons. First, O'Brien's estate incorrectly relies on language from *Cooney v. Park County,* 792 P.2d 1287 (Wyo.1990), for the proposition that the phrase "common law defenses" encompasses only absolute immunity defenses. The language from *Cooney* that the estate relies upon addresses to what extent the doctrine of qualified immunity applies when a government official is sued in his or her individual capacity under 42 U.S.C. § 1983. *See Cooney,* 792 P.2d at 1291. The *Cooney* court's discussion of qualified immunity in the context of a § 1983 claim has no relevance in interpreting the phrase "common law defenses" in § 1–39–102(a) of the WGCA.

[¶ 50] The estate's proffered interpretation of the phrase "common law defenses" in § 1–39–102(a) also belies the ordinary and obvious meaning of the phrase as it is used in the context of the WGCA. Reading § 1–39–102(a) and § 1–39–112 *in pari materia,* I find that the Wyoming legislature unambiguously expressed an intent to allow a defendant who has been sued under § 1–39–112 to assert all applicable common law tort defenses that have been recognized in Wyoming or any other jurisdiction. Section 1–39–102(a) permits a defendant to assert defenses such as consent, privilege, or self-defense, depending upon the tort theory asserted in the complaint. Section 1–39–102(a) also permits a defendant to assert the public duty rule as a defense to a negligence claim, as the public duty rule was a defense to negligence at

common law. *Wallace,* 773 N.E.2d at 1022; *Beaudrie,* 631 N.W.2d at 311; *Zimmerman,* 231 Ill.Dec. 914, 697 N.E.2d at 702; *Ezell,* 902 S.W.2d at 397; *Braswell,* 410 S.E.2d at 901; 57 Am.Jur.2d, *supra,* § 88.

[¶ 51] As a matter of statutory interpretation, a court must not interpret a statute in a manner that produces an illogical result. *Matter of Cordova,* 882 P.2d 880, 883 (Wyo. 1994). If this Court interprets the phrase "common law defenses" as encompassing only absolute immunity defenses, it would yield an illogical result. Such an interpretation completely ignores an entire body of common law tort defenses which have no theoretical relationship whatsoever to the immunity defenses. The unambiguous language of § 1–39–102(a) reveals a legislative intent to permit a defendant sued under § 1–39–112 to assert all available common law defenses, not just common law immunity defenses.

### Under the General Principles of Tort Law, County Defendants Did Not Owe a Duty to Daniel O'Brien

[¶ 52] Even if this Court does not apply the public duty rule in this case, the county defendants still did not owe a duty to Daniel O'Brien under the circumstances of this case. The estate claims that this case fits within the "tortious conduct of peace officers" exception in the WGCA. *See* § 1–39–112. When evaluating a peace officer's conduct under WGCA, this Court must apply general principles of tort law. *Keehn v. Town of Torrington,* 834 P.2d 112, 114 (Wyo.1992). The tort alleged by O'Brien's estate in this case is negligence.

[¶ 53] To prevail on a claim of negligence, the estate must allege and prove the existence of a duty, the breach of which was the proximate cause of harm. *See MacKrell v. Bell H₂S Safety,* 795 P.2d 776, 779 (Wyo. 1990). The initial inquiry focuses on whether a duty exists. *McCoy v. Crook Cty. Sheriff's Dep't,* 987 P.2d 674, 677 (Wyo.1999). Whether and to whom a duty of care exists under a given set of circumstances is a question of law to be answered by the Court. *Keehn,* 834 P.2d at 115.

### A. The balance of factors test for determining whether a legal duty exists.

[¶ 54] The concept of "legal duty" is often a very difficult concept to grasp. It is certain that no universal test has been formulated to ascertain the existence of a legal duty in any given case. Indeed, the conceptual difficulties associated with duty analysis are illuminated in the oft quoted language from Prosser and Keeton: "[I]t should be recognized that "duty" is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." W. Page Keeton, *Prosser & Keeton on Torts* § 53, at 358 (5th ed.1984). *See also Gates v. Richardson,* 719 P.2d 193, 196 (Wyo.1986) (quoting Prosser & Keeton).

[¶ 55] This Court has identified several factors which are relevant to the determination of legal duty. The relevant factors to be considered in assessing whether a legal duty exists are: (1) the foreseeability of harm to the plaintiff; (2) the closeness of the connection between the defendant's conduct and the injury suffered; (3) the degree of certainty that the plaintiff suffered injury; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden upon the defendant; (7) the consequences to the community and the court system; and (8) the availability, cost, and prevalence of insurance for the risk involved. *Duncan v. Afton, Inc.,* 991 P.2d 739, 744 (Wyo.1999). *See also Gates,* 719 P.2d at 196 (quoting *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976)).

[¶ 56] In addition to these eight factors, this Court considers the following additional factors when the defendant is a governmental entity: (1) the scope of the public entity's powers; (2) the role imposed on the public agency by law; (3) budget limitations; and (4) whether the enactment imposing the duty is designed to protect against the risk of a particular injury. *Pickle v. Bd. of Cty. Comm'rs of Platte Cty.,* 764 P.2d 262, 265 (Wyo.1988).

[¶ 57] A thorough analysis of the factors listed above leads to the inescapable conclusion that the county defendants did not owe a legal duty to Daniel O'Brien under the circumstances of this case.

### 1. Foreseeability.

[¶ 58] It was not foreseeable that Samuel Graumann would murder Daniel O'Brien following his escape from NCDC. The estate of O'Brien has not alleged specific facts to suggest that Graumann was likely to murder another human being. Moreover, the murder occurred in Denver, Colorado (over 280 miles away), approximately two days after Graumann escaped from NCDC. There is simply nothing to support the notion that the murder of O'Brien was foreseeable.

[¶ 59] While this case presents an issue of first impression in Wyoming, courts from other jurisdictions have uniformly held that no duty exists under similar circumstances. In *Graham v. State*, 354 So.2d 602 (La.App. 1977), that court held that the state owed no duty to protect a 12–year–old boy who was killed by an escapee from a state mental hospital. In *Graham*, the inmate's attack occurred several hours after his escape from the institution and at a place more than 100 miles from the hospital. Although the escapee had escaped, or attempted to escape, on several previous occasions, the hospital staff had no information which would lead them to believe that the escapee was likely to commit murder. Accordingly, the court held that the murder, which occurred more than 100 miles away from the escape site, was completely unforeseeable and unpredictable by the state, and, therefore, the state did not owe a duty to the victim. *Id.* at 605. In arriving at its decision, the *Graham* court stated:

> The incident in question occurred several hours after escape and at a place more than 100 miles from the institution. We presume that [escapee] armed himself with the knife after his escape. The attack, hours after escape, upon a 12 year old boy who was a complete stranger, in a city 100 miles distant from where [escapee] was institutionalized, was so unforeseeable and unpredictable that to hold the incident within the risk of harm sought to be pro-

tected against would impose total, unqualified liability on the State for any harm caused by an escaped inmate under any and all circumstances, irrespective of intervening time and distance. As a matter of policy, we are not prepared to extend liability to this degree.

*Id.* at 605–06. The court also noted the long recognized rule regarding liability of a county jail. The court stated:

> An institution's duty to restrain a convicted criminal is not based upon the purpose of protecting the general public from all harms that the prisoner might inflict if he were allowed to escape. A convicted person may be as dangerous on the day of his legal release as he was on the first day that he was confined, although the institution may still be under a legal duty to detain or to release him. There is no more reason for the State to be civilly responsible for the convict's general misconduct during the period of his escape than for the same misconduct after a legal release, unless there is some further causal relationship than the release or escape to the injuries received.

*Id.* at 603 (quoting *Green v. State*, 91 So.2d 153, 155 (La.Ct.App.1956)). Stated another way, "[t]he State's duty to protect the public from harm at the hands of escaped prisoners or inmates of public institutions does not extend to or encompass all harm which may be caused by such persons." *Graham*, 354 So.2d at 604.

[¶ 60] In *Nelson v. Parish of Washington*, 805 F.2d 1236 (5th Cir.1986), the Fifth Circuit Court of Appeals held that the sheriff's department did not owe a duty to a 9–year–old girl killed by an escapee. In *Nelson*, the escapee was serving a life sentence for the aggravated rape of a 9–year–old girl. Approximately thirteen days after escaping, the escapee raped and murdered another 9–year–old girl at a location over 750 miles from the point of escape. Based on the time and distance following the escape, the court held that the sheriff owed no duty to the victim. *Id.* at 1242. The court hinted at a bright line rule to assist with the difficult task of determining whether a duty exists in any given case. The *Nelson* court stated:

Only those people who reside within the vicinity of the prison, and who the prisoner injures within a reasonable time after his escape, may assert a cause of action against a negligent jailer. By requiring the escapee to have injured the victim during the course of his escape, the courts have necessarily imposed a time and space limitation upon the duty of a jailer to exercise reasonable care in preventing the escape of prisoners. This limitation, of course, is not static; rather it is dynamic and fact dependent. It is not incumbent upon this court, however, to construe the parameters of this limitation. Suffice it to say that Louisiana courts have never extended the duty to include a plaintiff who was injured as far as sixty miles and as long as eleven days after the prisoner's escape; to a plaintiff who was over one hundred miles from the escape; where the breach of duty and the duty breached were not sufficiently related to the injuries received as to import liability for damage resulting from the breach; and to a plaintiff whose injury lacked a closer connection between the act of the defendant and the injury to the plaintiff.

*Id.* (citations and quotation marks omitted).

[¶ 61] In *Buchler v. State,* 316 Or. 499, 853 P.2d 798 (1993), an escapee killed two people with a gun that he had stolen during a burglary following his escape. The killings occurred two days following the escape and fifty miles from the point of escape. In holding that no duty existed, the *Buchler* court stated:

It is not possible for a reasonable person to find from this record that a custodian would have known that this particular prisoner was likely to cause bodily harm of the kind that befell plaintiffs two days after his escape. The tragic death and injuries were not legally foreseeable results of this particular prisoner's escape.

*Id.* at 802 (quotation marks omitted).

[¶ 62] The Montana Supreme Court has similarly held that actions of an escapee are not foreseeable. In *United States Fidelity and Guaranty Co. v. Camp,* 253 Mont. 64, 831 P.2d 586 (1992), an escapee passed out in his apartment while smoking, and then start-ed a fire when he allowed his cigarette to fall onto the couch. That court held that "such actions and their consequences were not reasonably foreseeable and act as a supervening causes of appellant's injury, thereby absolving the respondent of liability." *Id.* at 590; *see also Solano v. Goff,* 985 P.2d 53 (Colo. App.1999) (murder by escapee was not foreseeable and sheriff owed no duty to the victim).

[¶ 63] In line with the above cases, the facts presented in this case irrefutably show that the actions of Samuel Graumann were not foreseeable. The murder committed by Graumann occurred more than two days after his escape from the NCDC. Moreover, the murder occurred more than 280 miles from the location of the escape. Under such circumstances, I would determine as a matter of law that Graumann's conduct was not foreseeable. Any other determination would lead to an unending window of government liability for the actions of escapees. If this Court determines that the conduct of Graumann was foreseeable, then when does an escapee's conduct cease to be foreseeable? One month? Six months? The burden and effects of imposing liability for such a tenuous connection between the escape and criminal action are contrary to the law of this state and other jurisdictions. This Court must draw a line. *See Nelson,* 805 F.2d at 1241 (quoting *Reid v. State,* 376 So.2d 977, 979 (La.Ct.App.1979)) (recognized impossibility of finding liability after a protracted time and distance from the escape point. The court posed the rhetorical question, "would recovery be allowed for the acts of an escapee who caused injury a score of years and several thousand miles from the place of escape.").

### 2. Closeness of Connection.

[¶ 64] The second prong of the "balance of factors" test looks at the connection between the alleged negligent act and the ultimate harm. As with foreseeability, it is clear that there is no connection between the county defendants' conduct in this case and Graumann's intentional criminal conduct while in Denver. Even if this Court assumes that the county defendants were negligent in their

supervision, as it must while considering a motion to dismiss, there is simply no connection between negligently allowing an individual to escape and a murder which occurred approximately two days later and over 280 miles away. The mere fact that Graumann escaped from NCDC does not create a connection to Graumann's criminal conduct.

[¶ 65] The estate has not alleged that the county defendants had any involvement in facilitating the murder of O'Brien. This fact is significant, as it shows the lack of connection between the alleged negligence by the county defendants and the murder of O'Brien perpetrated by Graumann. *See Andersen v. Two Dot Ranch, Inc.,* 2002 WY 105, ¶ 44, 49 P.3d 1011, ¶ 44 (Wyo.2002) (This Court found it significant that defendants did not take any affirmative steps to increase the likelihood of harm.).

[¶ 66] The estate also has not alleged facts sufficient to show a special relationship between O'Brien and the county defendants. The estate has not alleged that any employee of the county defendants had knowledge of O'Brien or that he was in jeopardy should Graumann escape. Moreover, the estate has not alleged that Graumann knew O'Brien before meeting him on or about September 12, 1999. Accordingly, there is simply no connection between the county defendants' alleged negligence and the unfortunate death of O'Brien.

### 3. Certainty of Injury.

[¶ 67] Without question, Graumann murdered O'Brien. However, it is unclear how this fact can militate in favor or against the existence of a duty. Firmly established Wyoming law makes it clear that the occurrence of an injury does not create liability. *See Anderson v. Duncan,* 968 P.2d 440, 443 (Wyo.1998); *see also Vasquez v. Wal–Mart Stores,* 913 P.2d 441, 443 (Wyo.1996). It necessarily follows that using the occurrence of an injury to establish the existence of a duty is inconsistent with basic tenets of Wyoming negligence law.

### 4. Moral Blame Attached to the County Defendants' Conduct.

[¶ 68] No moral blame attaches to the county defendants for the unfortunate death of O'Brien. Society requires that criminal offenders, both violent and nonviolent, be incarcerated in local jails and prisons. One of the unfortunate risks associated with operating a penal system is that prisoner escapes may occur. As stated in *Solano,* 985 P.2d at 55, "some risk to the public is a consequence of balancing society's needs against the practical realities of operating a penal system."

[¶ 69] It is interesting to note that had this escape occurred at the Wyoming State Penitentiary (WSP), the State of Wyoming would have immunity under the WGCA, as correctional officers at the WSP are not "peace officers" for purposes of the WGCA. This fact is significant to the consideration of moral blame attributable to the county defendants herein. It is highly unlikely the Wyoming legislature would grant the WSP immunity for conduct which is repugnant to the morals of society. By extension, one must reason that an escape from county detention, while unfortunate, does not warrant an imposition of moral blame.

### 5. Policy of Preventing Future Harm.

[¶ 70] It is clear that nobody wants to see an incident like the one which gave rise to this lawsuit. However, the policy of preventing future harm must be balanced with the practical realities of operating a penal system. "Short of keeping prisoners in a locked down status, the [county] defendants could not guarantee that some prisoners would not commit a violent act given the opportunity." *Solano,* 985 P.2d at 55.

[¶ 71] This Court has recognized the inequities associated with unrealistic expectations. In *Anderson v. Two Dot Ranch,* this Court noted that "[p]reventing future harm can only be fully assured through physically restraining livestock from wandering across roads by fencing them." *Anderson,* ¶ 44 (discussing the open range doctrine). The pragmatic approach employed by this Court in *Anderson* applies equally to the relevant policy considerations in this case.

### 6. Extent of the Burden on Defendant.

[¶ 72] Prisoner escapes in Wyoming are very few and far between. Nonetheless, the

burden from imposition of a duty upon the county defendants would be substantial. Graumann killed O'Brien in Denver, Colorado, approximately two days after his escape from the NCDC. If a legal duty were found to exist in this case, the county defendants would be exposed to a never-ending window of liability. In essence, if a prisoner were to escape, the government would be responsible to all people, anywhere, at anytime following an escape. While the estate of O'Brien can argue that it does not seek an unending window of liability, there is simply no practical way to limit the ramifications of finding a legal duty in this matter. Any rule of law which establishes a duty in this case would undoubtedly have a far reaching applications in Wyoming tort law. Accordingly, the burden on the county defendants must be considered substantial.

### 7. Consequences to the Community and Court System.

[¶ 73]   If this Court finds that the county defendants owed a duty to O'Brien in this case, the consequences to the courts in this state will be significant. While prisoner escape cases are rare, the consequences of imposing a duty on the county defendants will have a far reaching application beyond the confines of this case. Traditional notions of foreseeability and causal connection will be called into question in future tort cases. This impact would be significant to the court system and citizenry alike in this state.

### 8. Availability of Insurance.

[¶ 74]   This case falls under the State Self–Insurance Program. Wyo. Stat. Ann. §§ 1–41–101 to 111 (LexisNexis 2003). This fact should be irrelevant to the duty analysis in this case. As with any suit against the government, the presumption is that the public coffer has sufficient reserves to pay a judgment. However, the financial condition of county defendants should not be used to consider issues associated with duty or liability.

### 9. Scope of the Public Entity's Power and the Role Imposed on the Public Agency by Law.

[¶ 75]   Each sheriff in Wyoming acts as the custodian of the jail in his county. Wyo. Stat. Ann. § 18–3–603 (LexisNexis 2003). The unambiguous language in § 18–3–603 limits the custodial responsibilities of a Wyoming sheriff to the geographic limits of his county. With respect to the county defendants, the custodial responsibilities of § 18–3–603 extend no further than the geographic boundaries of Natrona County, Wyoming. *See, e.g., Lewis v. State,* 15 S.W.3d 250, 255 (Tex.App.2000) (both common law and statutory law limit a sheriff's authority to the geographic limits of his jurisdiction); *Hayes v. Parkem Indus. Serv., Inc.,* 598 So.2d 1194, 1197 (La.Ct.App.1992) (a sheriff thus has no duty to act outside of the geographic boundaries of this jurisdiction). The county defendants thus could not owe a duty to protect O'Brien from an intentional criminal act committed in Colorado because the county defendants had no legal authority to act in Colorado to prevent the criminal act from occurring.

### 10. Budget Limitations.

[¶ 76]   Given the procedural posture of this case, this Court must accept as true those facts alleged in the amended complaint. The facts as alleged in the amended complaint do not suggest that budget limitations had any bearing on the events which resulted in Graumann's escape from the NCDC.

### 11. Whether the Enactment Imposing the Duty is Designed to Protect Against the Risk of a Particular Injury.

[¶ 77]   Section 18–3–603 states that "[e]ach sheriff has charge of the jail and the prisoners therein confined in his county." Nothing in the language of § 18–3–603 suggests that the statute is designed to protect against the risk of particular injury. Section 18–3–603 merely charges the sheriff with the general responsibility of operating the jail within his county.

[¶ 78]   This case presents the circumstance where, applying the "balance of the factors" test, this Court must determine as a matter of law that the county defendants did not owe a duty to plaintiff. The intentional acts of Graumann in killing O'Brien were

attenuated from his escape and not foreseeable by the staff at NCDC. The remaining factors likewise militate against finding a duty.

## B. There is no common law duty to protect or warn third parties.

[¶ 79] There is not now, nor has there ever been, a common law duty to act for the protection of others or to control the conduct of a third person to prevent him from causing physical harm to another. *State Dep't of Corrections v. Vann*, 650 So.2d 658, 660 (Fla. App.1995). This absence of duty has been recognized in §§ 314 and 315 in the Restatement (Second) of Torts. The Restatement provides as follows:

### § 314. Duty to Act for Protection of Others

The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.

\* \* \* \*

### § 315. General Principle

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts §§ 314, 315 (1965).

[¶ 80] The above Restatement sections have been often employed by various courts in determining that the government does not owe a duty to the victim of a prison escapee. For instance, in *Thompson v. Cty. of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728, 733–34 (1980), the court recognized the general rule that one owes no duty to control the conduct of another. Absent an exception to this general rule, there is no duty to protect a third party from harm. There is no special relationship or exception which could give rise to the finding of a duty on the part of the county defendants in this case.[2]

[¶ 81] Similarly, in *Davenport v. Community Corrections of the Pikes Peak Region, Inc.*, 962 P.2d 963, 967 (Colo.1998), the Colorado Supreme Court applied Restatement (Second) of Torts § 315 to determine that the correction facility did not owe a duty to the victim for the conduct of an escaped prisoner. In *Solano*, the Colorado Court of Appeals resorted to the general duty principles contained in the Restatement in holding that the correctional facility was not liable to the murder victim of an escaped prisoner. The Colorado court noted that in general no duty is imposed upon a person to take action for the protection of another even if it is reasonably apparent that such action is necessary. 985 P.2d at 54.

[¶ 82] As Judge O'Brien noted in his dissenting opinion in *Pickle*:

[P]ublic entities ... do not owe a duty *in tort* to individual members of the public unless: 1) there was a special relationship between the governmental body and those individuals; or, 2) it is clearly the intent of the legislature to impose a tort duty for the benefit of the plaintiffs irrespective of any special relationship.

764 P.2d at 270 (O'Brien, D.J., dissenting) (citing *Tarasoff v. Regents*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, and *Halvorson v. Dahl*, 89 Wash.2d 673, 574 P.2d 1190 (1978)).

[¶ 83] In this case, there is no allegation or evidence of a special relationship between the county defendants and O'Brien. Additionally, there is no clear legislative intent of a statutory duty for the benefit of O'Brien. Thus, as a matter of law, the county defendants did not owe a duty to O'Brien.

---

**2.** The court in *Thompson* distinguished *Tarasoff v. Bd. of Regents* by the nature of the threat and parties in that case. In *Tarasoff*, the victim was the known and specifically foreseeable and identifiable victim of the patient's threat. Under such circumstances, the court concluded that it was appropriate to impose liability on those defendants for failing to take reasonable steps to protect the victim. *Id.* at 734. In this case, the victim was not foreseeable or identifiable. Rather, Daniel O'Brien was unknown to the NCDC staff and was simply an unforeseeable and unfortunate victim of a random murder by Graumann.

[¶ 84] O'Brien's estate argues that this Court should find the existence of a duty on the part of the county defendants because the murder of O'Brien occurred "in the course of inmate Graumann's escape" from NCDC. In support of this argument, the estate cites *Webb v. State*, 91 So.2d 156 (La. Ct.App.1956). Not only does *Webb* not support the estate's argument, the case actually accentuates the infirmities of the estate's action against the county defendants.

[¶ 85] In *Webb*, the prisoner escaped from Angola Prison after stealing an employee's gun in the process. The inmate also consumed drugs and alcohol which were stolen from prison employees. The morning following his escape, the inmate shot a victim at a residence which was near the prison. In finding the existence of a duty in *Webb*, the Louisiana court found the temporal and geographical proximity of the escapee's violent act to be determinative. That court stated:

> The loose security in failure to check [inmate] exposed the inhabitants of the community in the **immediate proximity to Angola,** including [victim], to just the type of injury she sustained. Were it not for the State's negligence this injury would not have happened. It is definitely foreseeable that convicts escaping through the negligence of the state would harm the **people in the Angola area.** This injury was directly within the **risk area** created by the negligence by the State and its employees.

91 So.2d at 162 (emphasis added). The court further stated, "It is clearly foreseeable that an armed, and possibly crazed, convict might shoot someone **in the risk area** while attempting to perfect an escape." *Id.*

[¶ 86] In the instant case, the murder of O'Brien occurred approximately two days following Graumann's escape. In addition, the murder occurred in Denver, Colorado, approximately 280 miles from NCDC. The rationale used by the Louisiana court in *Webb* has no application to this case. However, as mentioned earlier, a Louisiana case which does bear some similarity to this case is *Graham v. State*, 354 So.2d 602 (La.Ct.App. 1977).

[¶ 87] The *Graham* case involved an escapee's attack on a victim more than 100 miles from the point of escape. The *Graham* court determined that the attack was not within the immediate proximity of the escape nor was it in the "risk area" of the negligence of the institution employees. Accordingly, the court in *Graham* held that the attack was not foreseeable and that the state institution did not owe a legal duty to the victim. *Id.* at 605. I would follow the reasoning of the court in *Graham* and determine that the county defendants did not owe a legal duty to O'Brien. *See also LeBlanc v. State*, 393 So.2d 125, 127 (La.Ct.App.1980) (court determined that corrections officials did not owe a duty to the victim of an escaped convict).

[¶ 88] O'Brien's estate apparently asks this Court to disregard the first two factors of the "balance of factors test" employed by this Court to assist in determining whether a legal duty exists.[3] The estate cites to Justice Cardine's dicta in *Pickle*, 764 P.2d at 265 ("the first two factors are rather vague and not often useful") in an effort to have this Court ignore the lack of foreseeability and lack of connection between Graumann's escape and the murder of O'Brien. Common sense tells us that the dicta in *Pickle* does not suggest that Wyoming courts should disregard the first two factors. Rather, the language merely establishes that the balance of factors must be individually considered on a case by case basis. Indeed, in decisions subsequent to *Pickle*, this Court has considered all factors, giving each factor the consideration it is due under the facts of the partic-

---

**3.** As already mentioned, the balance of factors test includes the following factors to be considered:

    1) The foreseeability of harm to the respondent;

    2) the closeness of the connection between the defendant's conduct and the injury suffered;

    3) the degree of certainty that the plaintiff suffered;

    4) the moral blame attached to the defendant's conduct;

    5) the policy of preventing future harm;

    6) the extent of the burden upon the defendant;

    7) the consequences to the community and the court system; and

    8) the availability, cost and prevalence of insurance for the risk involved.

ular case. With this basic *ad hoc* premise in mind, this Court must apply the relevant factors to the facts of this case.[4]

[¶ 89] In this case, the first two factors (foreseeability and causal connection) must be given considerable weight. Otherwise, a duty would be found to exist in every case involving harm inflicted by an escaped prisoner. Considering factors three through eight, it is clear that the degree of certainty that the victim suffered injury would not change whether the escaped inmate committed murder two days or two years after his escape. Similarly, the moral blame as argued by O'Brien's estate would not be lessened over time if a death has occurred at the hands of an escaped prisoner. Further, the policy of preventing future harm will remain static, and will not be altered no matter how much time passes between escape and harm. Finally, the burden, cost, and consequences will remain the same for any case when an escaped inmate harms a member of society. Accordingly, to follow the estate's argument and disregard foreseeability and causal connection would mean the imposition of a duty on defendants no matter how attenuated or distant the violent act is from the escape.

[¶ 90] The estate's approach is contrary to the duty law of this state and other jurisdictions. Indeed, O'Brien's estate acknowledges in its response brief that a duty cannot be found in every case involving an escaped prisoner. However, to avoid a preordained result regarding the existence of a duty, this Court must consider the pertinent factors which are subject to change in every case: foreseeability and causal connection.

[¶ 91] The facts of this case, alleged by O'Brien's estate, establish that the actions of

Graumann were not foreseeable by the county defendants. His actions occurred approximately two days after escape, at a location almost 280 miles from NCDC. Under such circumstances, Graumann's actions were simply unforeseeable. In addition, considering the time and distance from his escape at NCDC, there is no causal connection between the alleged negligence on the part of the county defendants and the random murder committed by Graumann.

[¶ 92] Other jurisdictions to consider the issues of foreseeability and causal connection in relation to the conduct of an escaped inmate have similarly held that the government defendants owed no legal duty to the victim. In *Moss v. Bowers*, 216 N.C. 546, 5 S.E.2d 826 (1939), an individual was killed by an escaped prisoner. In *Moss*, the escaped prisoner commandeered a vehicle and traveled some distance to another city where he shot and killed the victim. The victim's wife then filed suit alleging that the sheriff had been negligent for allowing the escape as well as for failing to properly report the escape to surrounding communities. The North Carolina Supreme Court affirmed the dismissal of respondent's complaint stating:

> [I]n this case, considered as to its foreseeability, and in the most favorable light thrown on the transaction in the complaint, we do not regard the injury and death of plaintiff's intestate as being within the natural and probable consequences of the negligent or wrongful acts imputed to the sheriff and his co-defendant.

*Id.* at 828. Similarly, in *Commonwealth of Kentucky v. Vester*, 956 S.W.2d 204 (Ky. 1997), the Kentucky Supreme Court held

---

4. The "balance of factors" test employed in Wyoming was adopted from the California case of *Tarasoff v. Regents*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). In *Tarasoff*, the California Supreme Court found that a psychologist had a duty to warn the intended victim of a patient. It must be remembered that in *Tarasoff* there was a specific threat made concerning a specific *identifiable* person. It is interesting to note that, since the holding in *Tarasoff*, California courts employing the "balance of factors" test have refused to find the existence of a duty in situations like the one present in this case. *See, e.g., Brenneman v. State of California*, 208 Cal. App.3d 812, 256 Cal.Rptr. 363 (1989) (In case

where paroled child molester murdered a paper boy, the court held that there was no duty on the part of the state to control the conduct of the parolee or warn the county residents of the potential danger.); *see also Thompson v. Cty. of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980) (Extremely dangerous youth with violent propensities threatened that, if released, he would kill some young child living in the neighborhood. The court held that the county had no duty to warn the police or the mothers of the neighborhood children concerning the juvenile's release or propensities, noting the general rule that one owes no duty to control the conduct of another).

that actions of an escaped inmate were not foreseeable by the government defendant. In *Vester*, the victims lived fifty miles from the prison and their deaths occurred six days after the escape. Based on the time and distance involved between the escape and the harm, the Kentucky Supreme Court held that the respondent's complaint should properly be dismissed. *Id.* at 206. Considering the time and distance between Graumann's escape from NCDC and his murder of Daniel O'Brien, I would follow the overwhelming weight of this line of cases and determine as a matter of law that the county defendants did not owe a duty to O'Brien.

[¶ 93] O'Brien's estate also erroneously relies on *Darrar v. Bourke*, 910 P.2d 572 (Wyo.1996), in support of its argument that the county defendants owed a duty to O'Brien. The general principles enunciated in *Darrar* have no application to this case. In *Darrar*, the district court determined as a matter of law that the peace officers involved were entitled to qualified immunity. This Court reversed, holding that factual questions existed whether the peace officers involved were entitled to qualified immunity. *Id.* at 577. This Court did not pass on the question of duty. Indeed, the singular issue determined was whether good faith immunity could be determined as a matter of law. The issue of qualified immunity is not present before the Court. The underlying question whether county defendants owed a duty to O'Brien is a question which must be determined as a matter of law. In this case, there is no basis for the imposition of a duty against the county defendants.

[¶ 94] Courts from other jurisdictions faced with the same issue involved in this case have almost universally held that the government defendants did not owe a duty to the victim of an escaped inmate. *See State Dep't of Corrections v. Vann*, 650 So.2d at 660. Many of these courts rely on §§ 314 and 315 of the Restatement (Second) of Torts for the general proposition that there is no duty to act for the protection of others, and therefore there is no duty owed to the victim of an escaped inmate. *See, e.g., Solano*, 985 P.2d at 54. O'Brien's estate ignores the weight of authority and does not address the application of Restatement (Second) of Torts §§ 314

and 315. The estate simply claims that the county defendants' duty in this matter was established, at least in part, by statute. However, the estate does not cite to a Wyoming statute which creates a duty on the part of the county defendants to protect O'Brien.

[¶ 95] Rather, O'Brien's estate asks this Court to rely on the so-called "Good Samaritan" law and impose a duty on county defendants. The "Good Samaritan" law is found at Restatement (Second) of Torts § 324A. The estate's reliance on the "Good Samaritan" law is without merit. Simply stated, the "Good Samaritan" law provides that a party, without a preexisting legal duty, who chooses to act for the benefit of a third party, must do so with reasonable care. As is apparent, this "rescue doctrine" has no relation to this case. *See Ellsworth Brothers, Inc. v. Crook*, 406 P.2d 520, 524 (Wyo.1965) (Restatement § 342A provides reasonable protection to the "Good Samaritan" who chooses to act for the benefit of a third person).

[¶ 96] O'Brien's estate apparently argues that the county defendants were good samaritans in this case. Applying the estate's apparent logic, the argument follows that the county defendants did not owe a duty to O'Brien, but gratuitously decided to act for the protection of O'Brien. This argument is nonsensical. There is no evidence that the county defendants knew of the existence of O'Brien as a probable victim of Graumann. Accordingly, there is simply no application of the "Good Samaritan" law to this case.

[¶ 97] O'Brien's estate also cites *Kotzebue v. McLean*, 702 P.2d 1309 (Ak.1985), for the proposition that the county defendants owed a duty to O'Brien. Once again, the legal authority cited by the estate does not support its argument. In *Kotzebue*, an individual called the police department and advised the police that he intended to kill another individual. The caller identified himself as well as his specific location. Fifteen minutes later, the caller killed another person. Under those circumstances, the Alaska court determined that the harm to the victim was foreseeable. *Id.* at 1314. However, the Alaska court was careful to construct a very

narrow exception to the common law rule that there is no duty to protect a third person. The Alaska court stated that "[r]ecognition of a duty and allowance of civil recovery in this case, however, **does not make the city responsible for injuries sustained by victims of criminal activity when the police receive vague, non-specific calls in which the victim, the assailant, and the assailant's location remain unidentified.**" *Id.* at 1314–15 (emphasis added).

[¶ 98] As is apparent, the *Kotzebue* opinion does not support the estate's case. In fact, the opinion points out the weakness of the estate's duty argument. As the Court is aware, the identity of the victim was unknown in this case. Similarly, the whereabouts of Graumann following his escape was unknown to county defendants. Accordingly, there is no basis to impose a legal duty against county defendants for the unforeseeable actions of Graumann almost 280 miles from the point of his escape. As there is no duty to protect O'Brien, the estate's complaint must fail as a matter of law.

### The Alleged Negligence of Petitioners Was Not the Proximate Cause in this Case

[¶ 99] In its response brief, O'Brien's estate raises the issue of "proximate case." This issue was not raised by county defendants in their opening brief. To thoroughly address the issues raised by the estate, it is necessary to address the estate's proximate cause argument.

[¶ 100] The county defendants in this case owed no duty to Daniel O'Brien. Additionally, as a matter of law, the county defendants' conduct was not the proximate cause of the victim's death. Although proximate cause is generally a question for the jury, where no issues of fact are present and only one conclusion can be drawn from the evidence, the issue becomes one of law for this Court to determine. *See Turcq v. Shanahan*, 950 P.2d 47, 52 (Wyo.1997). In this case, there is no evidence that could possibly show a causal link between any conduct by county defendants and Daniel O'Brien's death. Accordingly, dismissal is appropriate as a matter of law.

[¶ 101] In Wyoming, "the law does not charge a person with all the consequences of a wrongful act, but ignores remote causes and looks only to the proximate cause." *Kopriva v. Union Pacific Railroad Co.*, 592 P.2d 711, 713 (Wyo.1979). "The proximate cause of an injury is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred." *Id.* (quoting *Lemos v. Madden*, 28 Wyo. 1, 10, 200 P. 791, 793 (1921)). Graumann's intentional criminal conduct in Denver was not the natural and continuous sequence of events following his escape.

[¶ 102] O'Brien's estate argues that the murder would not have occurred if Graumann had not escaped. However, it is not sufficient to simply state that an act would not have occurred "but for" the defendant's conduct. This Court has consistently rejected the notion of "but for" causation, explaining that "[i]f the original wrong furnished only the condition or occasion, then it is the remote and not the proximate cause, notwithstanding the fact that there would have been no loss or injury but for such condition or occasion." *Kopriva*, 592 P.2d at 713 (quoting *Lemos*, 28 Wyo. at 12, 200 P. at 794). This Court further stated:

A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated, and efficient cause of the injury, even though the injury would not have occurred but for such condition or occasion. If no danger existed in the condition except because of the independent cause, such condition was not the proximate cause; and, if an independent negligent act or defective condition sets into operation the circumstances which result in injury because of the prior defective condition, such subsequent act or condition is the proximate cause.

*Kopriva*, 592 P.2d at 713 (quoting *Fagan v. Summers*, 498 P.2d 1227, 1230 (Wyo.1972)).

Under Wyoming law, the alleged negligence of the county defendants was not the proximate cause of O'Brien's death.

[¶ 103] As noted, approximately two days had elapsed from the date of escape to the murder of O'Brien. In addition, the murder occurred more than 280 miles from where the escape occurred. It stretches the bounds of common sense to argue that the murder of O'Brien was a "natural and continuous sequence, unbroken by an efficient intervening cause" following Graumann's escape from NCDC. *See Kopriva,* 592 P.2d at 713. There is simply no way a reasonable jury could find that the county defendants' alleged negligence was the proximate cause of O'Brien's death. Further, as noted in *Kopriva,* the intentional criminal conduct of Graumann approximately two days following his escape must be viewed as an intervening cause of O'Brien's death.[5] I would determine that the alleged negligence of the county defendants was not the proximate cause of injury. *See Nelson v. Parish of Washington,* 805 F.2d 1236, 1238–39 (5th Cir.1986) (holding that negligence by jail was not proximate cause of victim's death, the court stated, "It is still unthinkable that anyone shall be liable to the end of time for all the results that follow in endless sequence from [a] single act. Causation cannot be the answer...."). *See also Reddish v. Smith,* 468 So.2d 929, 933 (Fla. 1985) (court held that negligence by jail in allowing escape was not the proximate cause of death); *Collie v. Hutson,* 175 Ga.App. 672, 334 S.E.2d 13, 14 (1985) (court held that detention facility's negligence was "too remote to be the basis of recovery").

[¶ 104] A similar result was reached in *McCoy v. Crook Cty. Sheriff's Dep't,* 987 P.2d 674 (Wyo.1999). In *McCoy,* Hulett police officers stopped an individual for "hot-rodding" around Hulett on a motorcycle. At the time of the stop, the motorcycle driver was uncooperative and verbally abusive. After calling in backup, the police officer issued four citations to the motorcycle driver but did not arrest him. Subsequent to the police stop, the driver of the motorcycle was involved in a serious accident which ultimately caused his death. The parents of the deceased motorcycle driver claimed the police officers were negligent for not arresting the decedent at the time of the stop. *Id.* at 675–76. The district court granted the defendant's motion for summary judgment. The district court determined that the officers owed no duty to the decedent and the officer's negligence, if any, was not the proximate cause of his death. *Id.* at 676. This Court affirmed the decision of the district court to dismiss the respondent's complaint. *Id.* at 678.

[¶ 105] Similar to *McCoy,* the county defendants in this case had no control over the conduct of Graumann once he escaped from NCDC. There is simply no causal connection between the alleged negligence on the part of NCDC and the criminal actions of Graumann. Accordingly, I would determine as a matter of law that the alleged negligence by county defendants was not the proximate cause of injury to O'Brien.

[¶ 106] O'Brien's estate cites two Louisiana cases for the proposition that defendant's alleged negligence was the proximate case of O'Brien's death. The first case cited by the estate is *Webb v. State,* 91 So.2d 156 (La.App. 1956). As noted previously, the *Webb* case does not support the estate's argument. In *Webb,* the prisoner stole a gun, alcohol, and drugs from prison employees prior to escape. The very next morning, the inmate shot a resident living near the prison with the prison employee's gun. Under those circumstances, the Louisiana court determined that the injury occurred while the inmate was in the process of attempting to make good on his escape. Given the temporal and geo-

---

**5.** Under Wyoming law, an intervening cause is "one that comes into being after a defendant's negligent act has occurred, and if it is not a foreseeable event, it will insulate the defendant from liability. It is reasonably foreseeable if it is a probable consequence of the defendant's wrongful act or is a normal response to the stimulus of the situation created thereby." *Century Ready–Mix v. Campbell Cty.,* 816 P.2d 795, 802 (Wyo.1991). As a matter of law, the intentional acts of Graumann in this case were not foreseeable to county defendants. There is simply no way that a random murder two days following escape can be considered the "probable consequence" of his escape or the "normal response" by an escape. Accordingly, the actions of Graumann must be considered an intervening cause in this case.

graphical proximity of the shooting to the escape, the court found in favor of the plaintiff therein. This case has no similar connection between the escape and random murder two days later in another state.

[¶ 107] O'Brien's estate also cites *Geiger v. State,* 242 So.2d 606 (La.Ct.App.1970), in support of his argument that any negligence on the part of the defendants in this case was the proximate cause of O'Brien's death. *Geiger* similarly does not support the estate's argument. In fact, *Geiger* again establishes that the alleged negligence on the part of the county defendants in this case was not the proximate cause of O'Brien's death. In *Geiger,* two inmates on work detail escaped and went *directly* to the respondent's residence and forcibly raped the victim. The victim's residence was approximately *500 yards* from the location where the inmates were working. There was virtually no time lapse between the escape and the violent act perpetrated against the victim. Under those circumstances, the Louisiana court determined there was a factual question whether the government defendant's negligence was a proximate cause of injury. Of significance, the court noted that the close proximity of the victim's residence placed her within the zone of risk associated with the prison's negligence. The court quoted *Webb* at length for the proposition that residents in the "immediate proximity" to the prison are susceptible to being harmed by the negligence of the prison. *Id.* at 609–10.

[¶ 108] The cases relied upon by O'Brien's estate do not support his argument. The escapees' behavior in the cases which find that the negligence of the jail may be a proximate cause of harm occurred within the immediate vicinity of the jail. In this case, the murder of O'Brien occurred more than two days following Graumann's escape at a location approximately 280 miles from NCDC. There is simply no causal connection between the alleged negligence on the part of the county defendants and the murder of O'Brien. Reasonable minds could not disagree on this point. *See Azcona v. Tibbs,* 190 Cal.App.2d 425, 12 Cal.Rptr. 232 (1961) (court held that negligence of jail was not the proximate cause of harm and the actions of escaping prisoner was an intervening cause of harm); *State of West Virginia v. Fidelity & Casualty Co. of New York,* 263 F.Supp. 88 (S.D.W.Va.) (negligence of sheriff was not the proximate cause of the injuries inflicted by an escaped prisoner). I would determine as a matter of law that the alleged negligence on the part of county defendant was not the proximate cause of harm to O'Brien.

[¶ 109] In conclusion, I would reverse the district court and dismiss the amended complaint.