JUSTICE NELSON,
dissenting.
¶54 This Court’s public duty doctrine has claimed yet another innocent victim. Last time, it was Doris Nelson, a widow whose husband died as the result of medical care provided by an unqualified, unprofessional, and corrupt physician whom the State Board of Medical Examiners nevertheless licensed to practice medicine in this state. See Doris Nelson v. State, 2008 MT 336, 346 Mont. 206, 195 P.3d 293. This time, it is Leah Gonzales, a six-months-pregnant employee of a Bozeman Town Pump who was raped in the store’s restroom on April 3, 2005, while local law enforcement officers, having responded to her 911 call, were standing by outside the store.
¶55 In Doris Nelson, this Court held that since the laws governing the regulation of the practice of medicine protect all the people of Montana, they do not, therefore, protect any of the people of Montana. Doris Nelson, ¶¶ 35, 49-50. Today, the Court holds that because the law enforcement officers who responded to Leah’s 911 call owed a duty to protect all the citizens of Bozeman and Gallatin County, they did not, therefore, owe this duty to any of the citizens of Bozeman and Gallatin County. Opinion, ¶ 20. That is because under this Court’s public duty doctrine, “ ‘a duty owed to all is a duty owed to none.’ ” *158 Stephen Nelson v. Driscoll, 1999 MT 193, ¶ 21, 295 Mont. 363, 983 P.2d 972. Plaintiffs counsel will be hard-pressed to explain this to Leah, who surely will wonder why it is that because the police owed a duty to her and all other Bozeman and Gallatin County citizens on the evening of April 3, 2005, they did not, therefore, owe this duty to her individually, with the result that her negligence claim fails at its inception.
¶56 I continue to reject this senseless judge-created doctrine as a violation of Article II, Section 18 of the Montana Constitution. See Massee v. Thompson, 2004 MT 121, ¶¶ 89, 93-95, 321 Mont. 210, 90 P.3d 394 (Nelson, J., specially concurring and dissenting); Prosser v. Kennedy Enterprises, 2008 MT 87, ¶¶ 71-75, 342 Mont. 209, 179 P.3d 1178 (Nelson, J., dissenting). While I explained my reasoning in Massee and Prosser, I further develop those arguments below. But first, I explain that to the extent this Court insists on continuing to apply this juris-legislation, it should, at least, do so in accordance with its own court-made rules-here, the second “special relationship” exception to the public duty doctrine: “ ‘when a government agent undertakes specific action to protect a person or property.’ ” Stephen Nelson, ¶ 22.
The “Undertake Specific Action”Exception
¶57 At the outset, I agree with Justice Leaphart’s dissent as to Issue Two. There is a question of fact as to whether there was particularized suspicion justifying the officers having Leah lie on the ground and be handcuffed. Concurrence/Dissent, ¶¶ 38-47. The majority, who hold to the contrary, have exceeded the scope of appellate review and have improperly usurped the role of the jury in deciding that there was, in fact, particularized suspicion for conducting an investigatory stop of Leah and that the officers’ conduct was, in fact, reasonable.
¶58 But the same is just as true with respect to Issue One. First, there is no dispute that the Bozeman and Gallatin County officers learned through a 911 call that a robbery was in progress at the Town Pump. Second, there is no dispute that the officers undertook specific action to protect people and property by responding to the 911 call. Indeed, it belies all logic and common sense to suggest that the officers initially “disperse[d] throughout the City [to] check for suspicious activity” (as the City puts it) and then rushed to the Town Pump (arriving just minutes after Leah placed the call) for any other reason but ‘to protect a person or property.”Even the City concedes this point, acknowledging that the police “may have undertaken specific actions *159 to protect Gonzales, including responding to her 911 call regarding a possible robbery, establishing a perimeter around Town Pump, and contacting the Special Response Team.” Likewise, the County acknowledges that ‘the 911 dispatchers and the law enforcement officers involved did undertake actions in responding to what they perceived was a robbery in progress.” The County notes that the dispatchers made “extraordinary efforts” to locate the scene of the robbery and arranged to have law enforcement officers dispatched to the Town Pump. The County further observes that the officers then established a perimeter around the building and arranged for the implementation of the Special Response Team and a negotiator-all with the purpose of protecting people and property. Third, it is reasonable to infer, as we must, that the officers recognized the 911 call may have been made by someone in need of help (such as the victim of the robbery) and that upon arriving at the scene, they made tactical decisions as to how to proceed in order to address this possibility. See Debcon v. City of Glasgow, 2001 MT 124, ¶ 21, 305 Mont. 391, 28 P.3d 478 (“Any inferences to be drawn from the factual record ... must be resolved in favor of the party opposing summary judgment”-here, Leah). Fourth, there is no dispute that the officers arrived several minutes before Leah was raped. Fifth, there is no dispute that the officers were present outside the store while Leah was being raped inside. Sixth, and lastly, there is no dispute that the 911 dispatchers reported to the officers during the course of these events that a male at the other end of the line was ‘threatening” a female and that the female was “crying” and ‘Very frightened.”
¶59 Leah’s claim is that the officers failed to use reasonable care in responding to her 911 call and the robbery-in particular, by not using reasonable care to protect innocent persons inside the store from being further injured by the perpetrator of the robbery. In short, she claims the officers breached a legal duty and that this breach of duty was a substantial factor in the injuries she suffered. See Peterson v. Eichhorn, 2008 MT 250, ¶ 23, 344 Mont. 540, 189 P.3d 615; Busta v. Columbus Hosp., 276 Mont. 342, 371, 916 P.2d 122, 139-40 (1996); see also e.g. Massee, ¶ 48 (“[T]he Sheriffs negligence was a cause of Vickie’s death if it was a substantial factor in bringing it about.” (internal quotation marks omitted)). As we reaffirmed just last year, ‘Isjince negligence actions ordinarily involve questions of fact, they are generally not susceptible to summary judgment.” Fisher v. Swift Transp. Co., 2008 MT 105, ¶ 12, 342 Mont. 335, 181 P.3d 601. The only exception is where, on the facts presented, reasonable minds could not *160 differ. See Poole v. Poole, 2000 MT 117, ¶ 14, 299 Mont. 435, 1 P.3d 936; see also e.g. Peterson, ¶ 37. Here, however, reasonable minds certainly could-and, in fact, do-differ over the officers’ actions.
¶60 In this connection, Leah’s expert on police and security practices (whose affidavit Leah filed in the District Court) determined as follows:
Both the Bozeman Police officers and Gallatin Sheriffs officers acted with reckless disregard to a known risk of harm and deliberate indifference to Leah Gonzales’ welfare by failing to act on a crime in progress. This incident was not and never became a hostage incident or issue. Officers, specifically Greg Megargel, officer in charge of the scene, recklessly failed to quickly identify to the robber and rapist, [Menjivar], that the police were on the scene and ready to intervene and stop his actions. To the contrary, they backed out of [sight]. Had they used all of the information known to them the best police practices would have been to immediately identify their presence, secure the perimeter and intercept his actions against Leah Gonzales.
The information known to the police officers on the scene by their own observation included knowledge of the doors being unlocked and that there were two subjects in the store one of them obviously Leah Gonzales. She not only was known to work there, but officers on the scene knew her, and it was her cell phone that initiated the call and open line to the police. The open door meant unfettered access by the police to enter and intervene at will, which they chose not to do-a reckless and improper choice that violates best police practices. As time went on the police clearly had the opportunity to make a stealth entrance when Ms. Leah Gonzales was forced into the bathroom-an action the police clearly were aware of. Instead of a stealth entrance, the police simply remained stealth themselves while [Menjivar] was unfettered in his criminal actions against Leah Gonzales.
¶61 Nevertheless, a majority of this Court-evidently sitting as a quasi-jury-has decided as a factual matter that ‘the officers here were in no position to undertake specific actions to protect [Leah] until she came out of the store and her identity and role in the events were established.” Opinion, ¶ 28. This assertion founders on four factors. First, as just noted, the City and the County themselves acknowledge that the officers undertook specific action to protect a person or property by ascertaining the origin of the 911 call and the events transpiring at the other end of the line and responding en masse, and *161 in multi-agency force, to the location of the crime. Second, the County states that the officers’ actions with respect to Leah in fact did not depend on knowing her identity and role in the events. The County explains in its brief that “even had law enforcement been made aware that Leah Gonzales was inside the building, it would not ‘have altered, in any manner’ their response at the scene.” Third, the majority’s “finding” is not by any means established on the record before us-in fact, it is directly contradicted by Leah’s expert-and it is not this Court’s role to weigh and resolve conflicts in the evidence, to judge the credibility of witnesses, and to find the facts. That, rather, is uniquely the task of a jury. Sandman v. Farmers Ins. Exchange, 1998 MT 286, ¶ 45, 291 Mont. 456, 969 P.2d 277. Fourth, the reasonableness of the officers’ actions also is a question of fact, see In re Marriage of Bryant, 276 Mont. 317, 323, 916 P.2d 115, 119 (1996), and, as such, must be resolved by a jury, Sandman, ¶ 45.
¶62 The Court relies on Kepner v. Houstoun, 164 F. Supp. 2d 494 (E.D.Pa.2001), and Eves v. Anaconda-Deer Lodge County, 2005 MT 157, 327 Mont. 437, 114 P.3d 1037. See Opinion, ¶ 28. But these cases are readily distinguishable from the present case and thus lend no support to the Court’s decision here. Kepner arose out of a hostage situation at a Pennsylvania state hospital. The plaintiffs sued under 42 U.S.C. § 1983, alleging that state officials had violated their due process rights under the Fourteenth Amendment. Kepner, 164 F. Supp. 2d at 496-97. In the portion of the Kepner opinion cited by the Court, the federal district court discussed the “state-created danger” rule and duties which arise under the Due Process Clause as the result of special relationships between state agents and citizens. Kepner, 164 F. Supp. 2d at 498. The court ultimately determined that the plaintiffs had no cause of action under substantive due process principles. See Kepner, 164 F. Supp. 2d at 500-01. But the court did not in any way purport to state the law as it relates to the special relationship exception to the public duty doctrine. Kepner simply has nothing at all to do with the present case-factually, legally, or otherwise.
¶63 In Eves, Zachary (a voluntarily committed patient at the Montana State Hospital in Warm Springs) left the hospital grounds and walked into the countryside without telling anyone. The temperature that day was approximately 37 degrees, and there was snow on the ground. Once hospital staff discovered that Zachary had left, the nursing supervisor telephoned local law enforcement to report his disappearance. She asked if county police could locate him but did not ask for a search-and-rescue operation. Indeed, the dispatcher told the *162 nursing supervisor that because Zachary was a voluntarily committed patient, the police had no legal basis to stop and detain him. Thereafter, county police officer Blume was notified of Zachary’s disappearance, but he did not initiate a search. Instead, he ‘kept lookout for Zachary during his routine patrol of the general area where Zachary was believed to be.” He did not see any signs of Zachary, who was found several weeks later in a field approximately six miles from the hospital. See Eves, ¶¶ 4-5.
¶64 To the extent Blume actually undertook to protect Zachary, he did so by passively keeping ‘lookout” for Zachary during his routine patrol of the general area. Here, by contrast, officers from multiple agencies abandoned their “routine patrols” and undertook specific action. They responded to a 911 call arising out of a robbery at the Town Pump. They endeavored to ascertain who was inside and what was transpiring. When the 911 call through Leah’s cell phone was dropped, they didn’t pack up and leave; rather, they called the store’s land line and reestablished contact. All of this was done in an effort to protect people and property. Eves does not stand for the Court’s untenable proposition that when police officers respond to the scene of a robbery, they have no duty to use reasonable care regarding the protection and safety of victims inside. Obviously, they do have such a duty. Indeed, the police are in the business of rescue and prevention of injury to person and property. Accordingly, when these professionals involve themselves in an actual rescue, they are bound to do so in accordance with applicable standards of care and proper procedure. See e.g. City of Kotzebue v. McLean, 702 P.2d 1309, 1313-14 (Alaska 1985) (police officer who responded to a life-threatening phone call owed a duty of reasonable care to protect the plaintiff); Hopkins v. State, 702 P.2d 311, 319 (Kan. 1985) (“A law enforcement officer is obligated to use reasonable and ordinary care and diligence in the exercise of his duties, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other law enforcement officers in the same or similar locations.”); Restatement (Second) of Torts § 323 and cmt. a (1965) (one who undertakes to render services to another which he should recognize as necessary for the protection of the other’s person is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform or complete the undertaking). As Judge Keating pointed out in Riss v. City of New York, 240 N.E.2d 860 (N.Y. 1968):
No one questions the proposition that the first duty of government *163 is to assure its citizens the opportunity to live in personal security.... [I]f a stranger, who had absolutely no obligation to aid [the plaintiff], had offered her assistance, and thereafter [she was injured] as a result of the negligence of the volunteer, the courts would certainly require him to pay damages. Why then should the city, whose duties are imposed by law and include the prevention of crime and, consequently, extend far beyond that of the Good Samaritan, not be responsible? ... It is not a distortion to summarize the essence of the city’s case here in the following language: ‘Because we owe a duty to everybody, we owe it to nobody.” Were it not for the fact that this position has been hallowed by much ancient and revered precedent, we would surely dismiss it as preposterous. To say that there is no duty is, of course, to start with the conclusion. The question is whether or not there should be liability for the negligent failure to provide adequate police protection.
Riss, 240 N.E.2d at 862 (Keating, J., dissenting) (citations and paragraph breaks omitted).
¶65 While acknowledging that the responding officers undertook specific actions to protect people and property, the City and the County attempt to avoid this exception to the public duty doctrine by arguing that it applies only if the “detrimental reliance” exception also applies. See Stephen Nelson, ¶ 22 (“An exception to the public duty doctrine arises when there exists a special relationship between the police officer and an individual,” and “ ‘[a] special relationship can be established... (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; ....’ ”). In other words, they assert that we must “combine” these two exceptions into one. The City and the County then argue that Leah did not rely to her detriment on the officers’ actions because she did not know for sure that the call to 911 actually went through and that the police actually responded. This approach, however, lacks any support in our caselaw and is properly (albeit, implicitly) rejected by the Court. See Opinion, ¶¶ 27-29; see also Doris Nelson, ¶ 36 (“A special relationship can be established in one of four ways ....” (emphasis added)). The “detrimental reliance” exception is distinct from the “undertake specific action” exception.
¶66 Not only that, the approach argued by the City and the County belies common sense and, more importantly, what every person is taught by their parents and, indeed, by the police themselves. When *164 Leah covertly and blindly (as was necessary under the circumstances) pushed the “9-1-1” buttons on her cell phone, she took a substantial risk of being further injured by her attacker should he discover her maneuver. In fact, he threatened to kill her if she called the police. But she desperately needed help, and she did the one thing that every person does in dire circumstances: she tried to call 911, she tried to send out the ordinary citizen’s SOS, the average person’s mayday.See e.g. Jeffrey D. Hickman, Note, It’s Time to Call 911 for Government Immunity, 43 Case W. Res. L. Rev. 1067,1067 (1993) (‘Tn our modern society we are trained, almost from birth, that we should telephone 911 to summon help in the event of a medical emergency. Generally, when one calls 911, prompt help arrives quickly, and professional assistance is rendered, resulting in countless saved lives.” (footnotes omitted)); State v. Williams, 623 N.W.2d 106, ¶¶ 84-89 (Wis. 2001) (Prosser, J., concurring) (explaining that “there is widespread public understanding of the 911 system” and that “[i]t is a system that citizens expect to depend upon in their own emergencies’). While Leah no doubt hoped that she had pushed the right buttons, she knew that if she had, rescuers would undertake to protect and rescue her, and she expected that they would use reasonable care in responding to her call for help just as a person in medical need whose service dog dials “9-1-1” expects that if the call goes through, responders will be promptly dispatched and will exercise reasonable care in addressing the situation.[1] It is absurd to hold that although responding medical personnel owe a duty to the patient in the latter situation, the responding officers owed no duty to Leah here. Cf. Cummins v. Lewis County, 133 P.3d 458, ¶ 64 (Wash. 2006) (Chambers, C. Johnson, & Sanders, JJ., concurring) (“A government entity that encourages people to call it for medical emergencies should be liable for the foreseeable consequences proximately caused by its failure to exercise ordinary care.’).
¶67 Leah followed the rule that every one of us is taught from childhood: When in trouble and in need of assistance, call (or, at least, try to call) the police or the fire department; call 911! She did as she was taught, and she relied on the police-indeed, counted on them-to rescue her. That was the only reason why, at risk to her own safety, she dialed 911. Her subjective expectation that officers would undertake to protect her is not a function of her objective knowledge *165 that her plea for help was actually heard by them. The point is that she relied on the police, if her call did make.it through, to rescue her and use reasonable care in doing so. The same would be true if she had pressed an alarm button. While she might not know with certainty that the police had received the alarm, she would expect that if they had, they would exercise reasonable care when responding. As it turns out, Leah’s 911 call did make it through and the police did undertake to protect her. The real question at issue in this case-a question for the jury-is whether the officers used reasonable care in doing so.
¶68 For the foregoing reasons, I conclude that the officers undertook specific action to protect people and property at the Town Pump; that the second special relationship exception to the public duty doctrine therefore applies; and that genuine issues of material fact exist as to whether the officers acted with reasonable care, thus precluding summary judgment. M. R. Civ. P. 56(c).
The Public Duty Doctrine Generally
¶69 The “undertake specific action” exception aside, I disagree with the Court’s decision on a more fundamental level-namely, its perpetuation of the public duty doctrine itself. As noted, this antiquated judge-created doctrine, which effectively immunizes governmental entities and their employees from liability for their tortious conduct, is incompatible with Article II, Section 18 of the Montana Constitution, which states that “[t]he state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature.” See Prosser, ¶¶ 71-75 (Nelson, J., dissenting); Massee, ¶¶ 79-89, 93-95 (Nelson, J., specially concurring and dissenting). Not only that, the doctrine is incompatible with § 2-9-102, MCA, which states that ‘lejvery governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties whether arising out of a governmental or proprietary function except as specifically provided by the legislature” (emphasis added). It is inappropriate for this Court, by judicial fiat, to effectively immunize governmental entities for their torts and those of their employees when the Constitution and the Legislature have expressly stated that such immunity does not exist except as specifically provided by the Legislature.
¶70 Notably, many other courts, as well as other members of this Court, have likewise recognized that the public duty doctrine cannot *166 survive the abrogation of governmental immunity. See e.g. Massee, ¶ 98 (Regnier & Cotter, JJ., specially concurring) (T agree with most of Justice Nelson’s analysis and conclusion that it is difficult to sustain the Public Duty Doctrine in light of Article II, Section 18, of the Montana Constitution which abolished sovereign immunity in this state.’!); Adams v. State, 555 P.2d 235, 241-42 (Alaska 1976) (‘[T]he ‘duty to all, duty to no-one’ doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine.... Where there is no immunity, the state is to be treated like a private litigant. To allow the public duty doctrine to disturb this equality would create immunity where the legislature has not.’!); Martinez v. City of Lakewood, 655 P.2d 1388, 1390 (Colo. App. 1982) (‘The concept of a public duty cannot stand ... with the enactment of the statute abrogating sovereign immunity.”); Leake v. Cain, 720 P.2d 152, 160 (Colo. 1986) (‘[W]hether or not the public duty rule is a function of sovereign immunity, the effect of the rule is identical to that of sovereign immunity. Under both doctrines, the existence of liability depends entirely upon the public status of the defendant. The doctrine of sovereign immunity [has been abrogated, and n]othing in the provisions of the statutes dealing with governmental immunity leads us to conclude that the General Assembly intended to reintroduce a concept so closely related to absolute sovereign immunity.”(citation omitted)); Commercial Carrier v. Indian River County, 371 So. 2d 1010, 1015 (Fla. 1979) (‘[The public duty] doctrine is a function of municipal sovereign immunity and not a traditional negligence concept which has meaning apart from the governmental setting. Accordingly, its efficacy is dependent on the continuing vitality of the doctrine of sovereign immunity.’!); Beaudrie v. Henderson, 631 N.W.2d 308, 314 (Mich. 2001) (The notion that “where there is a duty to all, there is a duty to none” is “tantamount to a grant of common-law governmental immunity, an area already dealt with by statute in many jurisdictions.’!); Doucette v. Town of Bristol, 635 A.2d 1387, 1390 (N.H. 1993) (‘The protection provided by the public duty rule has been described as ‘a limitation on liability’ and as rendering a municipality ‘immune from liability.’ Consequently, we hold that the public duty rule impermissibly conflicts with the abrogation of common law municipal immunity in this State, and, therefore, will no longer be a recognized defense against claims of municipal negligence.” (citation omitted)); Schear v. Board of County Commrs., 687 P.2d 728, 731 (N.M. 1984) (‘[T]he ‘public duty-special duty’ rule has no viability outside the context of sovereign immunity.’!); *167 Ficek v. Morken, 685 N.W.2d 98, ¶¶ 28, 31 (N.D. 2004) (concluding that the public duty doctrine is ‘Incompatible” with a statute which provides that political subdivisions are liable for damages caused by an employee’s negligence under circumstances where the employee would be personally liable); Hudson v. Town of East Montpelier, 638 A.2d 561, 566 (Vt. 1993) (“[Although the [public duty] doctrine is couched in terms of duty rather than liability, in effect, it resurrects the governmental immunities that have been abrogated or limited by most jurisdictions over the last thirty-five years.”); Cummins, 133 P.3d 458, ¶ 35 (Chambers, C. Johnson, & Sanders, JJ., concurring) (‘The modern public duty doctrine ignores Washington’s legislative waiver of sovereign immunity by creating a backdoor version of government immunity unintended by the legislature.”); Coffey v. City of Milwaukee, 247 N.W.2d 132, 139 (Wis. 1976) (‘The ‘public duty’-‘special duty’ distinction ... set[s] up just the type of artificial distinction between ‘proprietary’ and ‘governmental’ functions which this court sought to dispose of in [abrogating the doctrine of governmental immunity]. Any duty owed to the public generally is a duty owed to individual members of the public.”); Natrona County v. Blake, 81 P.3d 948, ¶ 12 (Wyo. 2003) (“‘The public-duty/special-duty rule was in essence a form of sovereign immunity and viable when sovereign immunity was the rule. The legislature has abolished sovereign immunity in this area. The public duty only rule, if it ever was recognized in Wyoming, is no longer viable.’ ”); see also Eugene McQuillin, The Law of Municipal Corporations vol. 18, § 53.04.25, 197-98 (3d ed., West 2003) (‘The public duty rule is not technically grounded in government immunity, though it achieves much the same results.’]).
¶71 Again, the Legislature has decided that “[e]very governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties ... except as specifically provided by the legislature.” Section 2-9-102, MCA. Such liability attaches “under circumstances where the governmental entity, if a private person, would be liable to the claimant for the damages under the laws of the state.” Section 2-9-101(1), MCA. While the Legislature has provided for certain exceptions under which immunity is retained, see generally Title 2, chapter 9, part 1, MCA, the public duty doctrine is not one of the exceptions.
¶72 Under similar circumstances, the Ohio Supreme Court aptly observed that “[i]t is spurious logic to conclude that a doctrine that is, by definition, available only to public defendants can be consistent with a statute [waiving governmental immunity and] mandating that *168 suits be determined in accordance with rules of law applicable to private parties.” Wallace v. Ohio Dept. of Commerce, 773 N.E.2d 1018, ¶ 26 (Ohio 2002). The court concluded that
no matter what considerations of policy support the judicial application of the public-duty rule, we must remember that R.C. Chapter 2743 has legislatively set forth the public policy of this state. That policy, expressed in R.C. 2743.02(A)(1), is to allow suits against the state according to the same rules as between private parties, “except that the determination of liability is subject to the limitations set forth in this chapter.” (Emphasis added.) As we have stated previously, the public-duty rule is neither “set forth” in R.C. Chapter 2743 nor a rule of law applicable to suits between private parties. It is inappropriate for the court to engraft the public-duty rule as an additional limitation on liability that the General Assembly has not provided. If the public-duty rule is to become a rule of substantive law applicable to suits in the Court of Claims, it is the General Assembly-the ultimate arbiter of public policy-that should make it so by way of legislation. It is not this court’s role to apply a judicially created doctrine when faced with statutory language that cuts against its applicability.
Wallace, 773 N.E.2d 1018, ¶ 33 (footnote omitted); accord Brennen v. City of Eugene, 591 P.2d 719, 725 (Or. 1979) (‘In abolishing governmental tort immunity, the Legislature specifically provided for certain exceptions under which immunity would be retained, and we find no warrant for judicially engrafting an additional exception [such as the public duty doctrine] onto the statute.” (citation omitted)). Similarly, the Missouri Supreme Court announced last year:
In deference to the statutory waiver of sovereign immunity provided by section 537.600.1, this Court is no longer willing to apply the judicially-created protections of the public duty doctrine in a way that would insulate government entities from tort liability where the legislature has expressly abolished such immunity. Application of the public duty doctrine should not expand the scope of a sovereign’s immunity beyond that intended by statute, nor be contrary to the legislature’s intent.
Southers v. City of Farmington, 263 S.W.3d 603, 613 (Mo. 2008) (citations and footnote omitted).
¶73 Yet, this Court inexplicably persists in applying its public duty doctrine-and at an ever-increasing rate, no less. The Court has never articulated a meritorious basis for doing so in the face of constitutional *169 and statutory provisions to the contrary. In Doris Nelson, ¶ 35, the majority simply asserted that ‘tt]he rationale underlying this doctrine is that ‘a duty owed to all is a duty owed to none’ ’’-though one has to wonder how this logical absurdity constitutes a “rationale” for the doctrine. In Stephen Nelson, ¶ 21, the Court asserted that the doctrine “ ‘serves the important purpose of preventing excessive court intervention into the governmental process by protecting the exercise of law enforcement discretion.’ ” Stephen Nelson, ¶ 21 (quoting Ezell v. Cockrell, 902 S.W.2d 394, 400-01 (Tenn. 1995)). And in Prosser, ¶ 18, the majority opined that without the public duty doctrine, municipalities would be hopelessly mired in civil lawsuits and unduly constrained in their discretion to use limited resources to promote the general welfare.
¶74 Preventing unreasonable interference with the governing process and protecting against excessive governmental liability are two commonly cited justifications for retaining the public duty doctrine. See Leake, 720 P.2d at 158; Beaudrie, 631 N.W.2d at 313. As noted, however, the Legislature is the ultimate arbiter of public policy, and the Legislature has already decided that “[e]very governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties... except as specifically provided by the legislature T Section 2-9-102, MCA (emphasis added). The Legislature did not grant this Court the option of devising its own exceptions to the general tort liability placed on governmental entities by §2-9-102, MCA, which is reason enough for this Court to refrain from applying its public duty doctrine.
¶75 But to the extent the Court is adhering to the public duty doctrine based on the policy concerns noted above, those concerns simply cannot survive close examination. In this connection, “‘the trend has been to abolish the [public duty] rule.’ ” Ficek, 685 N.W.2d 98, ¶ 20 (citing cases and secondary authorities). As summarized in Ficek, ¶¶ 21-26, and McQuillin, The Law of Municipal Corporations §53.04.25,206-08, courts have abrogated or refused to adopt the public duty doctrine for various reasons:
1. The doctrine is in effect, if not in theory, a continuation of the abolished governmental immunity doctrine.
2. The doctrine has a harsh effect on plaintiffs who would be entitled to recover for their injuries but for the public status of the tortfeasor, and there has been a reasoned reluctance to apply a doctrine that results in a duty to none where there is a duty to all.
3. The doctrine creates confusion in the law and produces uneven *170 and inequitable results in practice. See e.g. Jean W. v. Commonwealth, 610 N.E.2d 305, 313 (Mass. 1993) (noting that courts “ ‘have not managed to draw an intellectually defensible line between immune “public”duties and actionable negligence’ ”); Beaudrie, 631 N.W.2d at 314 (“[A]ny attempt to draw a distinction between a government employee’s ‘public duty’ and ‘private duty’ has proven to be confusing and prone to arbitrary and inconsistent application.”).
4. Concerns over excessive liability are overstated. For one thing, the public duty doctrine is not the only protection municipalities have against massive liabilities. See e.g. § 2-9-108(1), MCA (limiting liability for damages suffered as a result of an act or omission of a government officer, agent, or employee). Moreover, the underlying purposes of the doctrine are better served by the application of conventional tort principles and the protection afforded by statutes governing sovereign immunity. Leake, 720 P.2d at 158; see also City of Kotzebue, 702 P.2d at 1314-15 (applying factors for determining whether city owed an actionable duty to the plaintiff); Ryan v. State, 656 P.2d 597, 598 (Ariz. 1982) (“We are also told that not only will the public treasury suffer but government will come to a standstill because its agents will be afraid to act. We can’t but recall the dire predictions attendant to the publication of [our decision in Stone v. Arizona Highway Commn., 381 P.2d 107 (Ariz. 1963), abolishing governmental immunity]. Arizona survived!’); Beaudrie, 631 N.W.2d at 315 (‘ÍA] traditional common-law duty analysis provides a far more familiar and workable framework for determining whether a public employee owes a tort-enforceable duty in a given case.’); Schear, 687 P.2d at 733-34 (‘The spectre of dire financial consequences to municipalities raised by some courts... is no more real in the context of law enforcement officers’ liability for negligence than it has proved to be in any other area in which sovereign immunity has been abolished.... [W]e are confident that any amounts associated with programs aimed at reducing law enforcement officers’ negligence, or awarded to victims of negligent performance of duty, will be far outweighed by the advantage to society of more responsive agencies.’); Wallace, 773 N.E.2d 1018, ¶ 38 (‘TC]onventional negligence principles already provide some measure of protection against the possibility of the state’s becoming the de facto guarantor of every injury somehow attributable to the actions of a state tortfeasor. A state defendant, *171 just like any private defendant, remains protected by traditional tort concepts of duty, including foreseeability and pertinent public-policy considerations.”); Brennen, 591 P.2d at 723 (noting that municipalities are protected from unlimited liability by statute and by principles of tort law); Hudson, 638 A.2d at 566 (“[C]oncerns over excessive government or public employee liability are baseless considering the limitations on liability afforded by conventional tort principles, various types of official immunity, or exceptions to waivers of sovereign immunity.”).
5. The doctrine is incompatible with tort-claims acts mandating that suits against public defendants be determined in accordance with rules of law applicable to private persons. See e.g. § 2-9-101(1), MCA (directing that liability be analyzed as though the governmental entity were a private person); Maple v. City of Omaha, 384 N.W.2d 254, 260 (Neb. 1986) (‘Nowhere [in the Political Subdivisions Tort Claims Act] is there found an exemption for the exercise of a duty owed to the public generally.”); Schear, 687 P.2d at 730 (‘Nothing in the [Tort Claims Act] refers to performance of either public or special duties.”).
6. The doctrine places the costs of inadequate government performance on the shoulders of the innocent victims of official negligence rather than spreading these costs throughout society, and it reduces the incentive for public bodies to see that the functions of government are carried out responsibly and with reasonable care. Stewart v. Schmieder, 386 So. 2d 1351, 1357 (La. 1980); see also Cummins, 133 P.3d 458, ¶ 64 (Chambers, C. Johnson, & Sanders, JJ., concurring) (“[Government should be accountable for its actions just as a private party is held accountable. Accountability encourages competency.”); Edward H. Ziegler, Jr., Rathkopfs The Law of Zoning and Planning vol. 4, §46.02[l][a], 46-9 (4th ed., 1996) (‘ÍT]he doctrine has the effect of removing an incentive to ensure that the functions of government are responsibly executed.”).
¶76 For these reasons, the dire consequences the Court fears if the public duty doctrine is not retained are simply not plausible; in fact, there are persuasive policy reasons to jettison the doctrine. But more importantly, this Court’s policy concerns are no justification for ignoring unequivocal constitutional and statutory directives. Article II, Section 18 abolishes governmental immunity; the Legislature has provided that every governmental entity is subject to liability for its torts and those of its employees except as specifically provided by the *172 Legislature, §2-9-102, MCA; and the Legislature has not enacted the public duty doctrine. Consequently, each time this Court applies its public duty doctrine, it flouts the will of the people, as expressed through the Constitution and legislative enactment, that our government and its agents generally be held liable for their torts. As I have said before, the public duty doctrine should be consigned to the dustbin of history, where it clearly belongs. Prosser, ¶ 75 (Nelson, J., dissenting).
¶77 Before concluding, I note Justice Leaphart’s contention that the viability of the public duty doctrine Vas not an issue in this case.” Concurrence/Dissent, ¶ 49. With respect, I disagree. The City, the County, Officer Anderson, and Officer Megargel have each asserted the public duty doctrine as a defense to Leah’s negligence claims. Leah, in turn, has disputed the doctrine’s applicability. As noted, the public duty doctrine shields governmental defendants from tort liability. Yet, the doctrine is judge-created, and the Legislature has proclaimed that “[e]very governmental entity is subject to liability for its torts and those of its employees ... except as specifically provided by the legislature under Article II, section 18.” Section 2-9-102, MCA (emphasis added). These facts are all self-evident, and I maintain that it is not the province of this Court, in case after case, to shield governmental defendants from tort liability in the face of express constitutional and statutory directives to the contrary. Whether or not Leah has made this point explicit in her appellate briefs is, in my view, not the issue. It is axiomatic that we are bound to faithfully uphold the Constitution and apply the laws enacted by the Legislature. See e.g. Mont. Const, art. Ill, §3. Moreover, as Justice Leaphart himself has previously pointed out, this Court is not required to blindly apply the law in conformance with the parties’ underlying assumptions. See State v. Zabawa, 279 Mont. 307, 319, 928 P.2d 151, 159 (1996) (Leaphart, Hunt, & Trieweiler, JJ., dissenting) (asserting that we are not bound by counsel’s assumptions concerning constitutional provisions; rather, we have a duty to provide an independent interpretation); see also Kudrna v. Comet Corp., 175 Mont. 29, 51, 572 P.2d 183, 195 (1977) (‘If the court were limited to the arguments and reasoning of counsel in its decisions of cases, to the exclusion of its own observations, many cases would lead us far from what we understand to be the true object of the court.” (internal quotation marks omitted)).
¶78 Indeed, I cannot agree with the proposition that we must consciously disregard express constitutional and statutory directives which bear directly on our resolution of a case simply because the *173 parties misapprehended the relevance of those directives, chose to ignore them, or simply were unaware of them. In fact, there is precedent for raising an applicable constitutional or statutory issue sua sponte. Just last year, in a decision which Justice Leaphart joined, the Court observed that ‘“a serious error which appears on the face of [the] record is reviewable, although not presented by the parties’ if ignoring the error would cause substantial injustice.” State v. Andersen-Conway, 2007 MT 281, ¶ 14, 339 Mont. 439, 171 P.3d 678 (brackets in Andersen-Conway) (quoting Kudrna, 175 Mont. at 51, 572 P.2d at 195); cf. Wolfe v. Dept. of Labor and Industry, 255 Mont. 336, 339, 843 P.2d 338, 340 (1992) (this Court may consider an otherwise procedurally-barred question if it “relates to a substantial or fundamental right of a litigant”); Cottrill v. Cottrill Sodding Service, 229 Mont. 40, 42, 744 P.2d 895, 896 (1987) (this Court may consider an otherwise procedurally-barred constitutional issue if it “ involve[s] broad public concerns’ ”). Relying on this rule, the Court “sua sponte” raised and decided an issue that was “dispositive” of the appeal, notwithstanding the parties’ failure to do so themselves, because ignoring the error would have caused substantial injustice. See Andersen-Conway, ¶¶ 14-19. Of course, this rule is not limited to criminal cases-indeed, it derived from a civil case (Kudrna)-and as applied to the facts here, I submit that applying the public duty doctrine to Leah’s tort claims in the face of Article II, Section 18 and § 2-9-102, MCA, constitutes a serious error and will cause her substantial injustice (she is being thrown out of court without even a trial), thus requiring our review of the doctrine’s viability.
¶79 Lastly, I respectfully disagree with the suggestion that questioning the validity of the public duty doctrine involves “prejudging” an issue. Concurrence/Dissent, ¶ 52. We are long past the point of “prejudging” this issue. In point of fact, the Massees asked us to abolish the doctrine five years ago. See Massee, ¶ 44; see also Prosser, ¶¶ 70-71 (Nelson, J., dissenting) (noting the Neighbors’ argument in the district court that the doctrine is unconstitutional). Moreover, Doris Nelson pointed out in the district court that the State’s argument that it had no duty of care “is basically a sovereign immunity argument, which clearly doesn’t apply under our constitution.” Then, on appeal, she argued that governmental immunity exists in this state only to the extent the Legislature has enacted statutes providing for it and that it is Tt]he function of the legislature, not this Court, to establish the public policy of the State” vis-a-vis governmental liability and immunity for its torts. Yet, rather *174 than remand the case for further proceedings on the question of whether the State owed Jack Nelson a duty, the Court instead invoked the public duty doctrine sua sponte-even though the parties had not briefed the doctrine and its exceptions on appeal, and even though the district court had declined to address the State’s duty argument in the first instance when ruling on the cross-motions for summary judgment-in order to affirm the district court’s decision that Doris could not sue the Board of Medical Examiners. See Doris Nelson, ¶ 34. Worse still, in its zeal to reach the desired result, the Court did not address three of the four exceptions to the doctrinenmost notably the question of whether Jack had relied to his detriment on the fact that the Board issued Dr. Stephenson a license to practice medicine. See Doris Nelson, ¶¶ 36-50.
¶80 The Court’s approach in these and other public-duty cases could easily lead a person to conclude that the validity of the public duty doctrine is settled. Thus, it is not surprising that Leah has not made the specific arguments that Justice Leaphart contends are missing from her briefs in this appeal. In any event, setting aside our difference of opinion as to whether the viability of the public duty doctrine is an issue in this particular case, one thing is clear: The doctrine’s underlying validity is, in fact, open to challenge in the proper case-presumably, a future case that directly challenges the public duty doctrine on constitutional grounds under Article II, Section 18, and statutory grounds under §§ 1-1-108, 2-9-101(1), and 2-9-102, MCA. See Massee, ¶¶ 79-95 (Nelson, J., specially concurring and dissenting); Prosser, ¶¶ 70-75 (Nelson, J., dissenting); Doris Nelson, ¶¶ 65-77 (Nelson, J., concurring in part and dissenting in part); ¶¶ 69-76, supra.
Conclusion
¶81 In sum, I conclude that this Court’s public duty doctrine is incompatible with Article II, Section 18 of the Montana Constitution and the liability/immunity provisions of Title 2, chapter 9, parts 1 to 3, MCA. There is little reason to believe that abolishing the doctrine would commence the parade of horribles the Court fears. But, in any event, the policy concerns cited by the Court do not justify the Court’s perpetuation of the doctrine. It is for the Legislature to weigh the public policy arguments and enact appropriate measures to protect governmental entities and their employees, if necessary. The Legislature has done so and has decided that every governmental entity is subject to liability for its torts and those of its employees *175 acting within the scope of their employment or duties, except as specifically provided by the Legislature. It is not for this Court to create and perpetuate its own exceptions to §2-9-102, MCA. As one court has noted, when a court applies the public duty doctrine in the face of statutory abrogation of sovereign immunity, “ ‘the judicial responsibility for governmental irresponsibility is very grave indeed.’ ” Brennen, 591 P.2d at 724 (quoting K. Davis, Administrative Law Treatise vol. 3, §25.06, 458-59 (1958)).
¶82 Meanwhile, Leah will no doubt be dumbfounded by the Court’s decision. During the course of a robbery, she managed surreptitiously to call 911. The call went through, the dispatchers ascertained what was occurring and where, and the police were sent to Leah’s location. Upon arriving, they established a perimeter around the Town Pump, determined that the door was unlocked, and observed two individuals inside. They ascertained that one of the individuals (Menjivar) was directing the other individual (Leah). When the call from Leah’s cell phone was dropped, the dispatchers established a connection on the store’s land line. They told the officers that the male (Menjivar) was “threatening” the female (Leah) and that she was “crying” and “very frightened.” The police saw Menjivar and Leah enter the restroom, where it turns out Leah was then raped. They arrested Menjivar when he left the store of his own volition. They then threatened Leah with a dog, at which point she exited the store, barefoot and wearing her Town Pump apron. They forced her to the ground and handcuffed her-although she was six months pregnant and one of the officers had recognized who she was.
¶83 Leah claims the officers acted negligently and unreasonably, but the Court holds that the officers owed her no duty to exercise reasonable care when they responded to her distress call. The Court explains that because the officers owed all members of the public a duty to protect and preserve the peace, they did not owe this duty to any members of the public. Opinion, ¶ 20. If Leah is confused by this, I, for one, do not blame her. Indeed, the Court’s decision makes no sense. We have now ruled, as a matter of law, that when the police respond to a crime in progress, they have no duty to protect the victim of the crime because they have a duty to protect everybody. Thus, the victim is simultaneously entitled and not entitled to reasonable police protection. We have also ruled, as a matter of law, that regardless of expert evidence that the police breached the appropriate standard of care, they are nonetheless immune from liability for such breach.
¶84 Leah may be surprised to learn that had the events of April 3, *176 2005, transpired across the border in North Dakota or Wyoming, she would be entitled to pursue her negligence claims. See Ficek, 685 N.W.2d 98, ¶ 28; Natrona County, 81 P.3d 948, ¶ 12. She may find it bewildering that in Montana, “a duty owed to all is a duty owed to none,” Doris Nelson, ¶ 35, but in some other states, ‘ta]ny duty owed to the public generally is a duty owed to individual members of the public,” Coffey, 247 N.W.2d at 139. She may be frustrated and shocked to learn that she is barred from pursuing her negligence claims not because of any constitutional or statutory barrier to those claims, but because of a judge-created rule that actually contravenes the Montana Constitution and statutes enacted pursuant thereto. See Mont. Const, art. II, §18; §2-9-102, MCA. Finally, she may be surprised to find out that:
* Notwithstanding her own personal knowledge of what she felt at the time, this Court has decided that Leah in fact did not rely on the police to come to her rescue (even though they did) because she did not know that her call to 911 had actually gone through and that the police had actually been dispatched to the store. Opinion, ¶ 29.
* The responding officers did not undertake to protect her until she came out of the store-at which point they forced her to the ground and handcuffed her. Their purpose in responding to her 911 call, surrounding the store, and attempting to ascertain what was transpiring inside was, apparently, for some other purpose but not to protect a person or property. Opinion, ¶ 28.
* Being forced to the ground and handcuffed, although one of the officers recognized Leah, “was at most a justified investigatory stop.” Opinion, ¶ 31.
* The officers were justified in forcing Leah to the ground and handcuffing her, Opinion, ¶ 34, but they did not owe her a duty of reasonable care or protection, Opinion, ¶¶ 20-29.
* Leah has been denied her fundamental right to her day in court under Article II, Section 16 of the Montana Constitution because of a judge-created rule that is outdated, logically absurd, and patently unconstitutional.
¶85 Whether the officers acted appropriately and with reasonable care when they responded to the Town Pump I cannot say. That is a question of fact for a jury of Leah’s peers to decide. It is not a decision to be made by the District Court or this Court. Leah presented the District Court with sufficient evidence to withstand summary judgment. She is entitled to a trial on her complaint. That she has *177 been thrown out of court and under the bus because of the public duty doctrine is unconscionable.
¶86 Montana’s courts have no business shielding the government or its actors from their own negligence, misconduct, misfeasance, or malfeasance. That is the Legislature’s job. Mont. Const, art. II, §18; §2-9-102, MCA. Montana’s courts have no authority to enact their own tort-relief act by devising exceptions to the rule that “[e]very governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties ... except as specifically provided by the legislature.” Section 2-9-102, MCA. The public duty doctrine is simply indefensible from a constitutional standpoint, a statutory standpoint, and a commonsense standpoint.
¶87 I would reverse and remand for a trial. I dissent.

 See e.g. Mia Carter, Dog Dials 911 to Save Owner, http://pettraining.suitel01.com/article.cfpi/dog dials 911 to save owner (Sep. 15, 2008).